[No. A106656. First Dist., Div. Two. June 22, 2005.]

LAURENCE TAIN et al., Plaintiffs and Appellants, v.
STATE BOARD OF CHIROPRACTIC EXAMINERS, Defendant and
Respondent.

COUNSEL

Veritas Justice & Bioethics Institute, David Prescott and Edwin Grauke for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Alfredo Terrazas, Assistant Attorney General, Frank H. Pacoe and Char Sachson, Deputy Attorneys General, for Defendant and Respondent.

Opinion

**RUVOLO, J.—**

I.

Introduction

Appellants Laurence Tain, Donald Nielsen, Robert Bitters, Stephanie Wattenberg, and Lori Prescott (appellants) hold degrees as doctors of chiropractic and are licensed to administer chiropractic treatment in California. Appellants appeal after the trial court dismissed their action against respondent State Board of Chiropractic Examiners (the Board) following the court's grant of the Board's motion for summary judgment.

In the underlying action, appellants challenge California Code of Regulations, title 16, section 302 (section 302), which defines the scope of chiropractic practice. They contend the trial court erred in granting summary judgment because section 302 impermissibly narrows the scope of chiropractic from that intended by enactment of the Chiropractic Initiative Act of 1922 (Chiropractic Act) (see Bus. & Prof. Code, § 1000) and as amended.[1] Appellants also assert that the trial court erred in rejecting their claims that section 302 is unconstitutional under the United States and California Constitutions. None of appellants' contentions has merit, and we affirm the judgment.

II.

Factual Background

■ Like that of the trial court, an appellate court's consideration of a motion for summary judgment begins with a review of the complaint to identify the issues framed by the operative pleading, in this case, appellants' second amended complaint (SAC). (See *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823, 834 [64 Cal.Rptr.2d 335].)

Appellants' SAC alleges four causes of action and seeks mandamus, declaratory and injunctive relief. In the first cause of action, appellants claim that section 302 is void and unenforceable because it is "inconsistent and in conflict with the practice rights granted chiropractors" under the Chiropractic

---

[1] The Chiropractic Act is an initiative measure approved by the voters in 1922. (See Bus. & Prof. Code, § 1000; the act is reprinted as amended at 3A pt. 1 West's Ann. Bus. & Prof. Code (2003 ed.) foll. § 1000, p. 424 et seq.)

Act. This cause of action also alleges that the Chiropractic Act is unconstitutional under the United States and California Constitutions because it violates appellants' fundamental due process rights and equal protection guarantees.

In the second cause of action, appellants allege that certain amendments to the Chiropractic Act mandate the inclusion of certain elective educational courses in the chiropractic curriculum and that this mandate evinces legislative intent to expand appellants' rights to practice chiropractic.

In the third cause of action, appellants claim that the 1976 and 1978 initiative amendments to the Chiropractic Act violate article II, section 12 of the California Constitution.[2]

In the fourth cause of action, appellants claim that Business and Professions Code section 4935 is unconstitutional on equal protection grounds.

On November 12, 2003, the Board filed both an answer to the SAC and a motion for summary judgment. On February 2, 2004, the trial court issued its order granting summary judgment. In its order, the trial court granted the motion as to appellants' first cause of action on the ground of res judicata. Relying on *People v. Fowler* (1938) 32 Cal.App.2d Supp. 737 [84 P.2d 326] (*Fowler*) and *Crees v. California State Board of Medical Examiners* (1963) 213 Cal.App.2d 195 [28 Cal.Rptr. 621] (*Crees*), the trial court stated, "[t]he law is well settled in California as to the validity of [section] 302 and the scope of chiropractic defined therein."[3] The motion was granted as to appellants' second cause of action on the grounds that "[a] writ of mandate does not lie to compel the performance of a discretionary agency action." As to appellants' third cause of action, the court ruled that appellants had failed to state material facts raising an issue of the unconstitutionality of the 1976

---

[2] Article II, section 12 of the California Constitution provides: "No amendment to the Constitution, and no statute proposed to the electors by the Legislature or by initiative, that names any individual to hold any office, or names or identifies any private corporation to perform any function or to have any power or duty, may be submitted to the electors or have any effect."

[3] Although the court used the term "res judicata," it is clear from the record that all parties understood the principal question in this case to be whether the decisions in *Fowler* and *Crees* were controlling precedent under the doctrine of stare decisis on the issues raised by appellants as to the proper interpretation of the Chiropractic Act. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] ["Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. Otherwise, the doctrine of *stare decisis* makes no sense."].)

and 1978 amendments to the Chiropractic Act, and that "a writ of mandate does not lie to compel the performance of a discretionary agency action." Lastly, the motion was granted as to appellant's fourth cause of action on the grounds that "[s]ection 4935 [of the Business and Professions Code] is consistent with the prohibition in the [Chiropractic Act] that chiropractors may not [penetrate] human tissues . . . ."[4] A judgment was entered dismissing appellants' case, and this appeal followed.

## III.

### DISCUSSION

### A.

■ The standards governing summary judgment motions and appellate review thereof are well established. Where a defendant is the moving party, it may meet its burden of showing that a cause of action has no merit—that is, that there are no triable issues as to any material fact—"by proving either that (1) one or more elements of the cause of action cannot be established, or (2) there is a complete defense to that cause of action. Once the defendant has met that burden, the burden shifts to the plaintiff to show the existence of a triable issue of material fact as to that cause of action or defense. [Citations.]" (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 161–162 [80 Cal.Rptr.2d 66].)

■ "We are not bound by the trial court's stated reasons or rationale. Instead, we review the summary judgment without deference to the trial court's determination of questions of law. [Citations.]" (*Sangster v. Paetkau, supra,* 68 Cal.App.4th at p. 163; see also *Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1143 [97 Cal.Rptr.2d 707]; *Transamerica Ins. Co. v. Superior Court* (1994) 29 Cal.App.4th 1705, 1713–1714 [35 Cal.Rptr.2d 259].)

■ In this case we are called upon to interpret provisions of the Chiropractic Act, which were adopted by the voters as initiative measures. Initiative measures, no less than statutes enacted by the Legislature, should, when possible, be interpreted according to the usual and ordinary meaning of their terms. (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) "Absent ambiguity, we presume that the

---

[4] The trial court's ruling as to the fourth cause of action is not at issue on appeal.

voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language. [Citation.]" (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 543 [277 Cal.Rptr. 1, 802 P.2d 317].) "In the case of a voters' initiative statute . . . the voters should get what they enacted, not more and not less." (*Hodges v. Superior Court* (1999) 21 Cal.4th 109, 114 [86 Cal.Rptr.2d 884, 980 P.2d 433].)

## B.

Appellants present a number of contentions regarding the scope of chiropractic practice, which requires consideration and interpretation of the Chiropractic Act. The historical context of the Chiropractic Act was set out in *People v. Schuster* (1932) 122 Cal.App. Supp. 790 [10 P.2d 204] (*Schuster*): "When the Medical Practice Act was adopted in 1913, it was the only act regulating the practice of the healing arts. It applied to chiropractors, and required them to have certificates issued by the board of medical examiners. But in 1922 an act regulating the practice of chiropractic was adopted as an initiative measure. (Stats. 1923, p. lxxxviii.)" (*Id.* at p. 792.) Significantly, when the initiative measure was presented to the voters, they were assured that the proposed Chiropractic Act "prohibits the use of drugs, surgery or the practice of obstetrics by chiropractors."[5]

Thus, as noted by the court in *Fowler*, the passage of the Chiropractic Act did not effect a repeal or amendment of any portion of the 1913 Medical Practice Act (the 1913 MPA). Instead, the Chiropractic Act provided a complete defense to an action brought for violating the 1913 MPA, to the extent one was practicing chiropractic as authorized by the Chiropractic Act. (*Fowler, supra,* 32 Cal.App.2d at p. Supp. 742.) The *Crees* court described the result of the Chiropractic Act as follows: "The only effect of the enactment of the Chiropractic Act on [the 1913 MPA] was to create a limited exception to the prohibition against practicing a healing art without a license from the Board of Medical Examiners; that a holder of a license to practice chiropractic may practice chiropractic (not medicine or surgery); and that is the limit of the exception. [Citations.]" (*Crees, supra,* 213 Cal.App.2d at p. 209.)

---

[5] This argument to the voters has been considered as an aid in the interpretation of the Chiropractic Act by the courts. (See, e.g., *Fowler, supra,* 32 Cal.App.2d at pp. Supp. 744–745; *Crees, supra,* 213 Cal.App.2d at p. 211.)

■ The Chiropractic Act also created respondent Board and empowered it to examine those desiring to practice chiropractic and issue licenses authorizing them so to do. (*Schuster, supra,* 122 Cal.App. at p. Supp. 792.) The Chiropractic Act provides that the "[B]oard may by rule or regulation adopt, amend or repeal rules of professional conduct appropriate to the establishment and maintenance of a high standard of professional service and the protection of the public." (Chiropractic Act, § 10.) Our appellate division has held that this provision in the 1922 Chiropractic Act "broadly authorize[s] the Board to adopt regulations implementing the statute." (*Oranen v. State Bd. of Chiropractic Examiners* (1999) 77 Cal.App.4th 258, 262 [90 Cal.Rptr.2d 287].)

■ Today, the Board's regulations are located in division 4 of title 16 of the California Code of Regulations. To be valid, an administrative regulation must be consistent with the legislation it is designed to implement. (See *Davies v. Contractors' State License Bd.* (1978) 79 Cal.App.3d 940, 948 [145 Cal.Rptr. 284] [reviewing court independently determines whether administrative regulation is inconsistent with policy of enabling legislation]; *Farm Sanctuary, Inc. v. Department of Food & Agriculture* (1998) 63 Cal.App.4th 495, 505 [74 Cal.Rptr.2d 75] [no regulation is valid unless " 'consistent and not in conflict with' " the legislation it is designed to implement].)

Section 7 of the Chiropractic Act (see 3A pt. 1 West's Ann. Bus. & Prof. Code, *supra,* § 1000-7) contains the only provision which undertakes to define or describe chiropractic or to declare what is authorized by a license issued under the Chiropractic Act. (*Crees, supra,* 213 Cal.App.2d at pp. 203–204; *Fowler, supra,* 32 Cal.App.2d at p. Supp. 745.) Section 7 provides that a chiropractic license "shall authorize the holder thereof to practice chiropractic in the State of California as taught in chiropractic schools or colleges; and, also, to use all necessary mechanical, and hygienic and sanitary measures incident to the care of the body, but shall not authorize the practice of medicine, surgery, osteopathy, dentistry or optometry, nor the use of any drug or medicine now or hereafter included in materia medica." (Chiropractic Act, § 7.)

Section 302 has been promulgated by the Board to implement section 7 of the Chiropractic Act. Section 302 allows "duly licensed chiropractor[s]" to "manipulate and adjust the spinal column and other joints of the human body and in the process thereof a chiropractor may manipulate the muscle and connective tissue related thereto." (Cal. Code Regs., tit. 16, § 302, subd. (a)(1).) In administering this modality of healing art, chiropractors are permitted to "use all necessary mechanical, hygienic, and sanitary measures

incident to the care of the body, including, but not limited to, air, cold, diet, exercise, heat, light, massage, physical culture, rest, ultrasound, water, and physical therapy techniques in the course of chiropractic manipulations and/or adjustments," including "vitamins, food supplements, foods for special dietary use, or proprietary medicines" not considered to be within the realm of medical practice. (*Id.*, subd. (a)(2) & (5).)

However, section 302 explicitly does not allow chiropractors to "practice surgery or to sever or penetrate tissues of human beings, including, but not limited to severing the umbilical cord" or "to use any drug or medicine included in materia medica . . . ." (Cal. Code Regs., tit. 16, § 302, subd. (a)(4)(E).)[6]

Appellants claim that section 302 is invalid because it narrows the scope of "chiropractic" to less than that intended by the Chiropractic Act and its amendments. In answering this argument, the Board insists that section 302 "merely articulates the scope of practice as set forth in *Fowler*[, *supra*,] 32 Cal.App.2d Supp. 737 and *Crees*[, *supra*,] 213 Cal.App.2d 195, 28 Cal.Rptr. 621" in that those cases "interpret the scope of practice under the Act as forbidding chiropractors to sever or penetrate human tissue, and thus forbid the use of hypodermic and acupuncture needles and syringes . . . ."

We believe our analysis of the permissible limits of practice by the holder of a chiropractic license under section 7 of the Chiropractic Act justifiably begins and ends with *Fowler* and *Crees*. In *Fowler*, a chiropractor was

---

[6] More fully, section 302 provides:

"(a) Scope of Practice.

"(1) A duly licensed chiropractor may manipulate and adjust the spinal column and other joints of the human body and in the process thereof a chiropractor may manipulate the muscle and connective tissue related thereto.

"(2) As part of a course of chiropractic treatment, a duly licensed chiropractor may use all necessary mechanical, hygienic, and sanitary measures incident to the care of the body, including, but not limited to, air, cold, diet, exercise, heat, light, massage, physical culture, rest, ultrasound, water, and physical therapy techniques in the course of chiropractic manipulations and/or adjustments. [¶] . . . [¶]

"(4) A chiropractic license issued in the State of California does not authorize the holder thereof:

"(A) to practice surgery or to sever or penetrate tissues of human beings, including, but not limited to severing the umbilical cord; [¶] . . . [¶]

"(E) to use any drug or medicine included in materia medica; [¶] . . . [¶]

"(5) A duly licensed chiropractor may employ the use of vitamins, food supplements, foods for special dietary use, or proprietary medicines, if the above substances are also included in section 4057 of the Business and Professions Code, so long as such substances are not included in materia medica as defined in section 13 of the Business and Professions Code. [¶] The use of such substances by a licensed chiropractor in the treatment of illness or injury must be within the scope of the practice of chiropractic as defined in section 7 of the Act." (Cal. Code Regs., tit. 16, § 302, subd. (a)(1), (2), (4)(A), (4)(E) & (5).)

charged with practicing medicine[7] without a valid license authorizing him to do so. (*Fowler, supra,* 32 Cal.App.2d at pp. Supp. 739–740.) Fowler's defense was that he was a duly licensed chiropractor, and his practice of medicine was within the scope of chiropractic practice allowed under the Chiropractic Act. (32 Cal.App.2d at p. Supp. 740.) The court concluded that section 7 of the act defining the scope of chiropractic practice authorized two things: "[first], 'to practice chiropractic as taught in chiropractic schools or colleges,' and [second], 'to use all necessary mechanical, and hygienic and sanitary measures incident to the care of the body.'" (32 Cal.App.2d at p. Supp. 745.)

As to the first clause, the *Fowler* court began by referring to several commonly used dictionaries available at the time the Chiropractic Act was enacted, including the "Standard Dictionary, 1913 edition," which defined "chiropractic" as "'A drugless method of treating disease chiefly by manipulation of the spinal column.'" (*Fowler, supra,* 32 Cal.App.2d at p. Supp. 745.) In addition to general philological references, the court went on to cite numerous appellate opinions from such disparate states as South Carolina, Montana, Massachusetts, Arkansas, Kansas, and Utah, which defined the scope of chiropractic in essentially the same way. This survey necessarily led the court to find that the "general consensus of definitions, current at and before the time the Chiropractic Act was adopted, shows what was meant by the term 'chiropractic' when used in that act." (32 Cal.App.2d at p. Supp. 746.)

Because there existed a consensus as to what was commonly known to be "chiropractic" in that day and time, the *Fowler* court rejected the defendant's view that the phrase "as taught in chiropractic schools or colleges" was vague or ambiguous: "Were the word 'chiropractic' of unknown, ambiguous or doubtful meaning, this clause, 'as taught' etc., might serve to provide a means of defining or fixing its signification, but there is here no such lack of clarity. The scope of chiropractic being well known, the schools and colleges, so far as the authorization of the chiropractor's license is concerned, must stay within its boundaries; they cannot exceed or enlarge them. The matter left to them is merely the ascertainment and selection of such among the possible modes of doing what is comprehended within that term as may seem to them best and most desirable, and so the fixing of the standards of action in that respect to be followed by chiropractic licensees." (*Fowler, supra,* 32

---

[7] Although it is unclear from the opinion itself, the trial record of *Fowler* showed that the defendant had removed a fetus from the womb of a female patient.

Cal.App.2d at p. Supp. 747.) As to the second clause, the court concluded that the phrase " 'to use all necessary mechanical, and hygienic and sanitary measures incident to the care of the body' " was not intended to change the scope of "chiropractic." (*Ibid.*)

As important, the court also determined that the limiting language at the end of this second clause did not constitute surplusage. It provides that a chiropractic license " 'shall not authorize the practice of medicine, surgery, osteopathy, dentistry or optometry, nor the use of any drug or medicine now or hereafter included in *materia medica.*' " (*Fowler, supra*, 32 Cal.App.2d at p. Supp. 748.) The court stated that the characterization of this limiting language as surplusage "was certainly not the position taken by the writer of the above-mentioned argument addressed to the voters; nor did the people have any such intent in adopting the act, if they paid any attention to the positive assurance given them by that argument, as we must suppose they did." (*Ibid.*) Instead, the apparent purpose for including this last phrase was to ensure that a chiropractor's employment of "mechanical, and hygienic and sanitary measures" did not otherwise evade the prohibition against practicing medicine or surgery, including the forbidden use of drugs, medical preparations, and the severing or penetrating of human tissue. (*Id.* at pp. Supp. 749–750.)

Twenty-five years later, *Crees* was decided. In *Crees*, the plaintiff chiropractors[8] sued for declaratory relief to have certain rights, immunities and privileges defined and declared under the 1913 MPA and the Chiropractic Act. (*Crees, supra*, 213 Cal.App.2d at p. 200.) Among other arguments, the plaintiffs claimed that to establish what is "chiropractic," it was necessary to present extrinsic evidence as to what was, and what had been, taught in chiropractic educational institutions and to consider the practices that had developed in the profession.

The *Crees* court rejected this argument and accepted the *Fowler* court's conclusion that the permissible limits of practice by the holder of a chiropractic license did not extend beyond the scope of "chiropractic" as that term was understood and defined in 1922, when the voters adopted the Chiropractic Act. Any attempt by chiropractic schools or colleges to extend these limits by teaching other subjects under the guise of chiropractic must fail. (*Crees, supra*, 213 Cal.App.2d at p. 204.) For support, the *Crees* court cited *In re Hartman* (1935) 10 Cal.App.2d 213 [51 P.2d 1104] with approval. (*Crees*,

---

[8] Also appearing as amicus curiae was the 600-member California Chiropractic Association. (*Crees, supra*, 213 Cal.App.2d at p. 202.)

*supra*, at p. 205.) The *Hartman* case held that, while section 7 of the Chiropractic Act "contains the additional clause 'as taught in chiropractic schools or colleges', the entire section must be taken as a whole and it cannot be taken as authorizing a license to do anything and everything that might be taught in such a school. A short course in surgery or one in law might be given, incidentally, and it would not follow that the section would then authorize a licensed chiropractor to engage in such other professions. It is not sufficient that a particular practice is taught in such a school. Under the terms of the statute it must meet the further test that it is a part of chiropractic, whatever that philosophy or method may be, and further that it shall not violate the provision which expressly forbids the practice of medicine. If such a practice is not a part of chiropractic but does constitute the practice of medicine, it is not authorized under this license even though it may be taught in such a school." (*Hartman, supra*, at p. 217.)

The *Crees* court stated that the Chiropractic Act does not authorize chiropractors to use drugs or medicines, or to practice obstetrics, sever an umbilical cord, or to perform an episiotomy because "[t]hese procedures all fall in the medical-surgical field . . . which chiropractors may not invade." (*Crees, supra*, 213 Cal.App.2d at pp. 211–212.) The court concluded by saying, "[i]f the chiropractic profession desires to expand the scope of their professional activities . . . they must turn to the people, from whom they received permission to exercise the privileges they now enjoy, for legitimation of these additional practices." (*Id.* at p. 214.)

The scope of authorization set forth in section 7 of the Chiropractic Act has been definitively and consistently interpreted by the courts of this state in accordance with the reasoning of *Fowler* and *Crees*. (See *In re Hartman, supra*, 10 Cal.App.2d at pp. 217–218 [use of a hypodermic needle not within scope of chiropractic practice]; *People v. Nunn* (1944) 65 Cal.App.2d 188, 193–195 [150 P.2d 476] [chiropractor cannot legally administer drugs by means of hypodermic devices or perform surgical operations]; *People v. Mangiagli* (1950) 97 Cal.App.2d Supp. 935, 939 [218 P.2d 1025] [chiropractor treating a case of uterine bleeding by gauze packing, blood transfusion, hypodermic injection and giving patient pills convicted of practicing medicine without a license]; *People v. Augusto* (1961) 193 Cal.App.2d 253, 257–259 [14 Cal.Rptr. 284] [chiropractor treating patient for arthritis and other physical ailments practicing outside scope of chiropractic license]; *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 585 [35 Cal.Rptr. 401] [person holding only chiropractic license cannot practice obstetrics].)[9] In our

[9] Numerous opinions of the Attorney General are in accord. See 58 Ops.Cal.Atty.Gen. 595 (1975) and 58 Ops.Cal.Atty.Gen. 558 (1975) [chiropractor may not perform colonic irrigations as this constitutes practice of medicine]; 39 Ops.Cal.Atty.Gen. 228 (1962) [chiropractor may not perform piercing of tissue to draw blood specimen as this constitutes the practice of

view, these cases have properly interpreted the wording of section 7 of the Chiropractic Act, and unequivocally demonstrate that there is no basis or rationale that would justify a finding that the Board overstepped its authority in adopting section 302.

Despite the obvious similarity between the issues addressed in *Fowler* and *Crees* and the arguments made by appellants here, appellants urge us not to follow these precedents. First, appellants maintain that the *Fowler* and *Crees* courts neglected to analyze the "whole Chiropractic Act," and such failure constitutes "strong[] reason" to overrule a prior decision. In their reply brief, appellants cite to a single paragraph in their SAC where they contend they raised the issue below that the whole Chiropractic Act has not been considered by any prior court. The pertinent part of the paragraph states, "[a]s a factual matter, the expression 'as taught in chiropractic schools or colleges' cannot fully be understood except in the context of the official 1922 ballot pamphlet, the Chiropractic Act as a whole, the 1913 MPA, prior medical acts, pre-1922 federal and state case law, the cultural and bio-medical context of the times and such other factors as will be shown according to proof at trial."

But in their briefs appellants do not cite to, or explain the importance of, any alleged unpublished portion of the Chiropractic Act that they believe is pertinent, nor do appellants address in their briefs how the *Fowler* and *Crees* cases should have been decided differently had the courts addressed this unpublished portion of the Chiropractic Act.

Furthermore, as we have already observed, both *Fowler* and *Crees* specifically state that section 7 of the Chiropractic Act is "the only provision . . . which undertakes either to define or describe chiropractic or to declare what is authorized by a license issued under the act." (*Fowler, supra,* 32 Cal.App.2d at p. Supp. 745; see also *Crees, supra,* 213 Cal.App.2d at p. 203.) Thus, there is no legitimate basis to conclude that any purported unpublished portion of the Chiropractic Act may be pertinent to determining the scope of practice rights of chiropractors, or how the conclusion reached in *both Fowler* and *Crees* was erroneous.

Appellants next argue that we should not follow *Fowler* and *Crees,* because in those cases the chiropractors: (1) sought different relief than appellants; (2) failed to present evidence of the existence of different schools of chiropractic teaching; and (3) failed to present case law that preceded the Chiropractic Act which would support appellants' position.

---

medicine]; 29 Ops.Cal.Atty.Gen. 178 (1957) [chiropractors may not remove hemorrhoids by certain procedures].)

It matters little that *Fowler* and *Crees* involved different claims for relief, or that they arose in different procedural contexts. In both cases, as in the present case, chiropractors sought a ruling allowing them to expand the scope of their practices beyond that which was allowed by the Board and the voters. The focus in *Fowler* and *Crees* was the proper interpretation of section 7 of the Chiropractic Act. The fact that the defendant in *Fowler* was facing criminal charges, and that the plaintiffs in *Crees* presented alternative arguments, does not detract from the legal issues both raised and disposed of by those cases, which are materially indistinguishable from those in this case.

At oral argument, appellants referred to portions of the record containing at least some of the 1922 ballot materials to support their argument that the scope of chiropractic practice intended by the Chiropractic Act is broader than section 302 permits. As we understand it, appellants assert that this discrepancy becomes apparent when the act is read in conjunction with the earlier 1913 MPA, and the curricula for chiropractic and drugless practitioner certificates mandated by these laws. Despite counsel's efforts, we disagree that any such intent emerges from reading the portions of the record as suggested. In conclusion, we are simply not convinced that *Fowler* and *Crees* were incorrectly decided, or that they failed to reach the proper interpretation of voters' intent in passing the Chiropractic Act.

Alternatively, appellants seek to distinguish this case from both *Fowler* and *Crees* by asserting they are from a "different school of chiropractic" than the parties in those cases, and, thus, are entitled to a different interpretation of the Chiropractic Act. Appellants have made no showing below or on appeal that such differences existed or, if they did, that they would have led the *Fowler* and *Crees* courts to different conclusions as to the scope of section 7.[10]

Moreover, as stated before, the limitations of the acts and practices appellants may legally perform under their chiropractic licenses are properly articulated by both *Fowler* and *Crees*. The holding of both cases is that section 7 of the Chiropractic Act limits authorized chiropractic healing practices to those taught in chiropractic schools at the time of the enactment of the initiative measure (1922), and that authorization cannot be enlarged by any changes of the curricula of those schools. Consequently, chiropractors are

---

[10] In their response to the Board's "Separate Statement of Disputed and Undisputed Facts," appellants claimed that one " 'school' included treatment by means of osseous and soft tissue manipulation, neurovisceral and neuromusculoskeletal care, physical and reflex therapeutics . . . and the full use of the naturopathic materia medica; but, prohibited the practice of allopathic medicine . . . ." The second school is not described in the record, nor in appellants' briefs on appeal.

confined to the established measures of adjusting the joints by hand, and to incidental mechanical and hygienic measures that do not invade the field of medicine and surgery. (See *Crees, supra,* 213 Cal.App.2d at pp. 202, 214.) There is nothing in the record that would suggest that the scope of section 302 does not reflect section 7's mandate that the practice of chiropractic be limited to that healing art as it was being taught in 1922. Given the clear holdings in *Fowler* and *Crees,* evidence such as the existence of different schools of chiropractic would not have changed the result in either case, even if the parties in these cases had tried to introduce such evidence.

Alternatively, and despite the *Fowler* and *Crees* decisions' holdings that section 7 of the Chiropractic Act is not vague or ambiguous, appellants rely on this appellate division's decision in *Evans v. McGranaghan* (1935) 4 Cal.App.2d 202 [41 P.2d 937] (*Evans*) to support their position that summary judgment was improper because they should have been afforded a chance to present extrinsic evidence as to the scope of permissible practice intended by the Chiropractic Act. In *Evans,* a chiropractor was sued by a former patient who claimed that the chiropractor had defaulted on a contractual promise to provide " 'modes of treatment [that] are within the scope of the practice under the provisions of the [Chiropractic Act].' " (4 Cal.App.2d at p. 204.) Only adjustments had been administered. (*Ibid.*) The complaint was dismissed when the patient failed to present any evidence as to what other modes of treatment should have been provided. The court affirmed the dismissal, holding that the trial court was unable to determine what was meant by the phrase in section 7, "as taught in chiropractic schools or colleges," without extrinsic evidence. (4 Cal.App.2d at p. 205.)

The *Fowler* court considered this comment in *Evans* and suggested that its reference to the absence of extrinsic evidence related to nothing more than the patient's failure to demonstrate that the chiropractor did not apply the "ascertainment and selection of such among the possible modes of doing what is comprehended within that term as may seem to [chiropractors] best and most desirable . . . ." (*Fowler, supra,* 32 Cal.App.2d at p. Supp. 747.) It then noted that if the *Evans* decision could be more broadly read, then "we prefer to follow the later *Hartman* case." (*Ibid.*)[11]

---

[11] The *Evans* court's reference to the need for extrinsic evidence cited authoritatively the case of *Schuster, supra,* 122 Cal.App.2d Supp. 790. *Schuster* was decided by the same court that decided *Fowler.* As to its reliance in *Evans, Fowler* stated: "If our opinion in [*Schuster*] is thought to go farther than this, we now qualify it in that respect, deeming the rule just stated [that the scope of chiropractic was not unknown, ambiguous, or doubtful] to be the proper one." (*Fowler, supra,* 32 Cal.App.2d at p. Supp. 747.)

Lastly, appellants argue that *Fowler* and *Crees* are not controlling because those cases fail to discuss certain case law that predates enactment of the Chiropractic Act that appellants contend is material to the issue. None of the three cases cited by appellants is relevant to the interpretation of the Chiropractic Act. In the first case, *Collins v. Texas* (1912) 223 U.S. 288, 296 [56 L.Ed. 439, 32 S.Ct. 286], the court found that states may appropriately set educational standards and prescribe minimum education requirements to practice medicine. We fail to see how *Collins v. Texas* would have changed the interpretation of the plain meaning of a California statute enacted a decade after this federal case.

In the second case, *People v. Ratledge* (1916) 172 Cal. 401 [156 P. 455], the California Supreme Court upheld the conviction of Mr. Ratledge, who was practicing medicine without a valid license. The court held that the curriculum of the 1913 MPA was not unreasonable, and people who practiced without a valid license according to that curriculum could properly be punished under that act. (172 Cal. at p. 407.) This case does not lend any support to a trial court interpreting the provisions of the Chiropractic Act, and we fail to see why appellants put so much emphasis on it.

In the last case, *People v. Chong* (1915) 28 Cal.App. 121 [151 P. 553], the defendant challenged the constitutionality of the 1913 MPA. The court held that the act was constitutional because the Legislature had the right to demand a standard of proficiency for medical doctors. (28 Cal.App. at p. 123.) Similar to the prior two cases, we fail to see the relevance of this case to appellants' case and to the interpretation of the Chiropractic Act. Certainly, the failure of the *Fowler* and *Crees* decisions to discuss them does not undermine the efficacy of these cases, nor does it constitute cause to allow appellants to relitigate the issues decided in those cases. Instead, we find that appellants' claims are precluded by the dispositive holdings of *Fowler* and *Crees*.

## C.

Appellants next contend that the scope of "chiropractic" as defined in section 7 changed with the 1978 amendment to the Chiropractic Act[12] (Stats. 1978, ch. 307, §§ 1–4, pp. 636–642 (the 1978 amendment), which was not addressed in either *Fowler* or *Crees*. For this reason, appellants argue that section 302 is now inconsistent with the 1978 amendment.[13]

---

[12] "CHAPTER 307 [¶] An act to amend an initiative act . . . approved by electors November 7, 1922, by amending Sections 4, 5, and 10 thereof, and by adding Section 20 thereto, relating to the practice of chiropractic . . . ." (Stats. 1978, ch. 307, p. 636; see 3A pt. 1 West's Ann. Bus. & Prof. Code, *supra*, §§ 1000-4, 1000-5, 1000-10 & 1000-20).

[13] Appellants also contend that the 1970 amendment to the Chiropractic Act changed the scope of practice of chiropractors. However, appellants do not address how that amendment is

Prior to the 1978 amendment to the Chiropractic Act, section 5 of the Chiropractic Act, which provides the prerequisites for applications for licenses and the minimum educational requirements to enable one to practice chiropractic in this state, stated, in pertinent part: "[t]he schedule of minimum educational requirements to enable any person to practice chiropractic in this State is as follows, except as herein otherwise provided: [¶] . . . [¶] Electives . . . 17 to 0%." This language was added to the Chiropractic Act by amendment in 1948. (Stats. 1947, ch. 151, § 3, p. 678.)

Section 5 was then changed by the 1978 amendment to the Chiropractic Act. The change is reflected in the current version of section 5, which states in pertinent part: "[t]he schedule of minimum educational requirements to enable any person to practice chiropractic in this state is as follows, except as herein otherwise provided: [¶] . . . [¶] "Electives . . . 15%." (See 3A pt. 1 West's Ann. Bus. & Prof. Code, *supra*, § 1000-5.)[14]

■ It is clear from the unequivocal text of the 1978 amendment that chiropractors are now required to take elective courses that amount to 15 percent of their total hours of study. By changing the text of the Chiropractic Act to "15%" from "17 to 0%," the voters expressed their intent to change the minimum educational requirements for electives from permissive to mandatory. We are bound by the plain meaning of the statute. (*J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1575 [33 Cal.Rptr.2d 206].)

■ Appellants argue that, even if section 302 was properly based on the curricula in chiropractic schools as of 1922, because electives are now mandatory, appellants' scope of practice has expanded to include the subject of those elective courses. This argument is premised on an incorrect reading of the 1978 amendment. The 1978 amendment deals only with section 5 of

---

alleged to have changed their scope of practice. Therefore, we address only the 1978 amendment.

[14] California Code of Regulations, title 16, section 331.12.2, which applies to students entering chiropractic schools after November 3, 1976, states in pertinent part: "(b) . . . The course of instruction completed by the applicant shall consist of no less than the following minimum hours, except as otherwise provided: [¶] . . . [¶] Electives . . . 660 hours. [¶] . . . [¶] (d) Additional Hours and Subjects: It is recommended that a school offer elective subjects, including chiropractic meridian therapy, counseling, hypnotherapy and biofeedback. The school may offer and require for graduation courses of more than 4,400 hours." Prior to November 3, 1976, schools were not required to offer elective subjects. (Cal. Code Regs., tit. 16, § 331.12.1, subd. (d) ["Additional Hours and Subjects. The school, if it desires, may offer and may require for graduation, course [*sic*] of more than 4,000 hours. Such additional hours may be in elective subjects"].)

the Chiropractic Act. We agree with *Fowler* and *Crees* that section 7 of the Chiropractic Act is the *only* provision of the act dealing with the scope of practice of chiropractors. (*Crees, supra,* 213 Cal.App.2d at pp. 203–204; *Fowler, supra,* 32 Cal.App.2d at p. Supp. 745.) Since the 1978 amendment to the Chiropractic Act did not change the wording or meaning of section 7 in any way, we find no support for appellants' assertion that their practice rights have expanded in any way.

Moreover, the 1978 amendment, which mandates that chiropractic students take elective courses, signals no legislative intent to expand their practice rights upon graduation. Such an interpretation would ignore the clear intent of voters in 1922 to limit the practice of chiropractic to that which existed *as of that point in time,* and instead to vest in chiropractic school administrators, who select the offering of electives, the ability to control the scope of practice of chiropractic in this state.[15] (See *Crees, supra,* 213 Cal.App.2d at p. 217.) In the words of *People v. Mangiagli, supra,* 97 Cal.App.2d at page Supp. 939: "[T]he limits of permissible practice by the holder of a chiropractic license . . . do not extend . . . beyond the scope of chiropractic as that term was understood and defined in 1922, and the ambitious attempts of chiropractic schools or colleges to extend them by teaching other subjects under the guise of chiropractic must fail, so long as the statute remains as it is now." Therefore, the scope of practice as fixed by section 7 continues to be valid and unaffected by the 1978 amendment to the Chiropractic Act.

## D.

As the trial court correctly concluded, "chiropractors do not have the right to penetrate human tissues by long established case authority and the scope of practice as defined in [the Board's] [section] 302." Appellants contend that interpreting section 7 of the Chiropractic Act as prohibiting, among other things, the insertion of needles into a person's body, as in the practice of acupuncture, is incompatible with due process and equal protection principles.[16]

---

[15] This is not to say that the offering of mandatory electives involving other forms of healing or educational subjects in institutions of chiropractic training will not have a salutary effect on students. Exposing students to this information outside the strict confines of chiropractic techniques give important context to chiropractic study, and is likely to make graduates better prepared for their chiropractic practices.

[16] Appellants also assert that section 302 violates "the right of patients to choose their own form of health care . . . ." Since appellants have brought this action on behalf of themselves as chiropractors, and not as patients, we find that appellants have no standing to bring a challenge on behalf of patients of chiropractors. (*People v. Anderson* (1991) 235 Cal.App.3d 586, 592 [286 Cal.Rptr. 734] ["Traditionally, one to whom a statute may constitutionally be applied

■  In analyzing claims based on violations of due process and equal protection, we must first determine the appropriate standard of review to apply.[17] "The proper standard of review, as developed by the high court, depends upon the classification involved in, and interests affected by, the challenged law. [Citation.] The challenged law will be subject to strict scrutiny only if it operates to the peculiar disadvantage of a suspect class [citation] or impinges on a fundamental right [citation]." (*Bowens v. Superior Court* (1991) 1 Cal.4th 36, 42 [2 Cal.Rptr.2d 376, 820 P.2d 600].)

■  Although appellants state that they possess "fundamental right[s]" "to fully develop their own medical/chiropractic paradigms" and to "realize their own individual identity within their chosen vocation and the full economic benefits of their profession," they neither cite any authority that establishes either as a fundamental right, nor do they present any argument as to why we should establish these rights as fundamental in the first instance. To the contrary, it is well established that "the right to a professional license or to continue practice pursuant to that license does not constitute a fundamental interest. [Citation.]" (*Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 776 [117 Cal.Rptr.2d 445].)

While appellants conceded the point that the mere possession of a professional license does not entitle one to protected status, they nevertheless assert that their allegations of discrimination are categorically different from the professional licensees in these cases. To make their argument, appellants' seize on language in *Bowens v. Superior Court, supra*, 1 Cal.4th at page 42, where the California Supreme Court described a "suspect class" as one which is " 'saddled with such . . . a history of purposeful unequal treatment . . . as to command extraordinary protection from the majoritarian political process.' [Citation.]" Appellants contend they are entitled to strict scrutiny review because they are a "suspect, or quasi-suspect, group" subjected to "a[n] historical pattern of subjugation and invidious discrimination." Once again, appellants fail to cite any authority to support this contention.

---

cannot challenge that statute on the ground it may conceivably be applied unconstitutionally to others in situations not before the court."].)

[17] "The Fourteenth Amendment's guarantee of equal protection and the California Constitution's protection of the same right (Cal. Const., art. I, § 7, subd. (a), art. IV, § 16, subd. (a)) are substantially equivalent and are analyzed in a similar fashion. [Citations.]" (*Kenneally v. Medical Board of California* (1994) 27 Cal.App.4th 489, 495 [32 Cal.Rptr.2d 504] (*Kenneally*).) Likewise, the Fourteenth Amendment's guarantee of due process and the California Constitution's protection of due process (Cal. Const., art. 1, § 7, subd. (a)) can be analyzed in a similar fashion. While we recognize our power and authority to construe the state Constitution independently (see *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352–354 [276 Cal.Rptr. 326, 801 P.2d 1077]), we find no pressing need to do so here.

"The determination of whether a suspect class exists focuses on whether '[t]he system of alleged discrimination and the class it defines have [any] of the traditional indicia of suspectness: [such as a class] saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.' [Citation.]" (*Bowens v. Superior Court, supra*, 1 Cal.4th at p. 42.) As a general rule, "[l]icensed physicians do not belong to a 'suspect class.' [Citation.]" (*Griffiths v. Superior Court, supra*, 96 Cal.App.4th at p. 776.) In addition to physicians, other cases have refused to find suspect classifications in persons who are dentists (*Naismith Dental Corp. v. Board of Dental Examiners* (1977) 68 Cal.App.3d 253, 261 [137 Cal.Rptr. 133]), psychoanalysts (*NAAP v. California Bd. of Psychology* (9th Cir. 2000) 228 F.3d 1043, 1049), or even lawyers (*Russell v. Hug* (9th Cir. 2002) 275 F.3d 812, 819, fn. 5, citing *Giannini v. Real* (9th Cir. 1990) 911 F.2d 354, 359).

To date, the United States Supreme Court has refused to extend the highest level of scrutiny under the Fourteenth Amendment beyond race and alienage to such classes as gender, sexual orientation, mentally handicapped, and other groups who have a history of discrimination far exceeding appellants' allegations of discrimination. (See, e.g., *Kenneally, supra*, 27 Cal.App.4th at p. 495, fn. 4 ["The Supreme Court has used [an] intermediate standard of review in cases involving gender classifications . . . ."];[18] *Romer v. Evans* (1996) 517 U.S. 620, 635–636 [134 L.Ed.2d 855, 116 S.Ct. 1620] [Supreme Court applied rational basis test to overrule Colorado's constitutional amendment that disallowed governmental organizations to put into effect legal protections from discrimination against homosexuals]; *Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 442 [87 L.Ed.2d 313, 105 S.Ct. 3249] ["we conclude for several reasons that the Court of Appeals erred in holding mental retardation a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation"].)

Given that appellants have failed to cite a single authority to support their contention that chiropractors are a suspect class due to an alleged history of invidious discrimination, and because the United States Supreme Court has

---

[18] Appellants have only requested that we apply the strict scrutiny test or, if we find that strict scrutiny does not apply, the rational basis test. Therefore, we do not address the issue of whether the intermediate standard of review, which has been limited in its application to cases involving gender discrimination and illegitimacy, would apply to appellants' case. (*Kenneally, supra*, 27 Cal.App.4th at p. 495, fn. 4.)

refused, thus far, to apply the strict scrutiny standard to putative classes who have far greater claims to past discrimination than appellants allege either in their SAC or in their briefs, we decline to apply the strict scrutiny standard in this case.

Alternatively, appellants complain that there is no rational basis for section 302, in that it does not recognize "chiropractors as having equal practice rights to drugless practitioners."[19] The issue of the alleged discriminatory differentiation between drugless practitioners and chiropractors was addressed by the *Crees* court. In that case, the court recognized that in claiming unequal treatment, the plaintiffs overlooked "the established principle that the Legislature may classify in the course of regulating different groups of persons, and that the classification will be sustained unless it is found to discriminate unreasonably in favor of one group and against another." (*Crees*, *supra*, 213 Cal.App.2d at pp. 217–218.) The court found that "plaintiffs [chiropractors] practice 'one school' of the healing art; drugless practitioners practice another. The training of the two groups is different; their respective practices of the healing art are not the same. It cannot therefore be said that providing separate classifications for the two professions and somewhat different regulations for each operates to discriminate unreasonably against chiropractors." (*Id.* at p. 218.)

Yet, appellants assert that the *Crees* court's distinction between chiropractors and drugless practitioners is dicta, arbitrary and capricious, and contrary to California Supreme Court precedent. The only evidence appellants put forth in support of their argument is a comparison of the educational requirements of drugless practitioners, based on the 1913 MPA as amended in 1920, and the educational requirements of chiropractors, based on the Chiropractic Act. Basically, the Chiropractic Act calls for a course of study embracing the same subjects as the 1913 MPA, but it extends over a period of 2,400 hours as opposed to 2,000 for the drugless practitioner. From this evidence, appellants argue that chiropractors should have the same practice

---

[19] A law review article, Note, *Quackery in California* (1959) 11 Stan. L.Rev. 265, provides the following description of the scope of the drugless practitioner's license and a historical overview of this type of practice: " 'The drugless practitioner's certificate authorizes the holder to treat diseases, injuries, deformities, or other physical or mental conditions without the use of drugs or what are known as medical preparations and without in any manner severing or penetrating any of the tissues of human beings except the severing of the umbilical cord.' [(Bus. & Prof. Code, § 2138.)] Section 2497 of the Business and Professions Code, added in 1943, revoked the authority of the Board of Osteopathic Examiners to issue drugless practitioner's certificates. In 1949, the sections of the Medical Practice Act relevant to the qualifications and practice of drugless practitioners were repealed. (Cal. Stat. 1949, ch. 233, § 3 at [p.] 458.) Grandfather clauses have allowed persons licensed as drugless practitioners . . . prior to abolition of the classification to continue practicing and to renew their licenses annually. [Citations.]" (*Id.* at p. 273, fn. 35.)

rights as drugless practitioners because their educational requirements surpass those of drugless practitioners.

■ To the contrary, we agree with the *Crees* court. The Legislature may regulate chiropractors and drugless practitioners differently according to what measures and regulations they feel are necessary to protect the public. The Chiropractic Act, its amendments, and section 302 are the fruit of the voters' judgment to limit the practice of chiropractic in a way that ensures that chiropractors do not practice outside the perceived scope of their skills. These laws are rationally related to the public interest of protecting the public from individuals the lawmakers deemed should be confined to healing arts within the *traditional* scope of that practice, to the exclusion of advances in technique, education, or through comparisons with others who practice a different healing art enjoying greater regulatory freedom.

In conclusion, based on the facts and evidence before us, we cannot find that section 7 of the Chiropractic Act and section 302 are " ' "palpably arbitrary and beyond rational doubt erroneous. [Citations.]" ' " (*Kenneally*, *supra*, 27 Cal.App.4th at pp. 499–500.) Therefore, we find that these provisions pass constitutional muster.

### E.

Lastly, appellants argue that the 1978 amendment to the Chiropractic Act violated article II, section 12 of the California Constitution by improperly delegating legislative control over chiropractors to the Council on Chiropractic Education (CCE). In this regard, they point out that the 1978 amendment to the Chiropractic Act changed the text of the act to state, in pertinent part, "[t]he board shall have power: [¶] . . . [¶] (g) To approve chiropractic schools and colleges whose graduates may apply for licenses in this state. The following shall be eligible for approval: [¶] (1) Any chiropractic school or college having status with the accrediting agency . . . ." (See 3A pt. 1 West's Ann. Bus. & Prof. Code, *supra*, § 1000-4.) The Chiropractic Act goes on to say, "[a]s used in this section, 'accrediting agency' means (1) the Accrediting Commission of the Council on Chiropractic Education, other chiropractic school and college accrediting agencies as may be recognized by the United States Commissioner of Education, or chiropractic school and college accrediting agencies employing equivalent standards for accreditation as determined by the board . . . ." (*Ibid.*)

Appellants claim that this change in 1978 violated article II, section 12 of the California Constitution, which states, in pertinent part, "no statute proposed to the electors by the Legislature or by initiative, that names . . . any

private corporation to perform any function or to have any power or duty, may be submitted to the electors or have any effect." "Article II, section 12 derived from two voter initiatives contained in former article IV, section 1d, a 1950 initiative and a 1964 initiative, both of which sought to prevent voters from 'confer[ing] special privilege or advantage on specific persons or organizations.' [Citation.]" (*Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565, 580 [63 Cal.Rptr.2d 148] (*Pala*).)

The 1978 amendment to the Chiropractic Act did not violate the California Constitution, in that it did not confer a special privilege or advantage on the CCE. The 1978 amendment did not appoint the CCE to perform any governmental function. The CCE is one of many organizations that can be considered "accrediting agencies" by the Board under the Chiropractic Act. The 1978 amendment did not designate the CCE as the entity empowered to accredit schools for the Board, nor did it establish that the CCE will perform any other function under the Chiropractic Act. Instead, the amendment only states that a school accredited by the "accrediting agency," of which CCE is one of many, can be selected for approval by the Board, which remains responsible for accrediting decisions. Consequently, the Board can reject a chiropractic school that the CCE approves, and can approve a chiropractic school that the CCE rejects, without violating the 1978 amendment.

The 1978 amendment to the Chiropractic Act also does not give the CCE any duties. As an accrediting agency under the 1978 amendment, the CCE is required to do nothing. They do not have to accredit any schools, nor do they have to assist in the approval process at all. Unlike here, the court in *Pala* found that the unconstitutional initiative "impose[d] functions, powers and duties" due to its repeated use of the word "shall" throughout the initiative. (*Pala, supra,* 54 Cal.App.4th at p. 584.) The 1978 amendment includes no such mandates. The CCE has no obligations or duties under the 1978 amendment.

Because we conclude as a matter of law that the accreditation system included in the 1978 amendment does not violate the express language of the California Constitution, we reject appellants' contention that they are entitled to a trial on the issue. No trial is necessary or appropriate. We need simply to look at the unambiguous, plain language of the initiative to determine that the 1978 amendment does not violate article II, section 12 of the California Constitution.

## IV.

### DISPOSITION

The judgment is affirmed.[20]

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied July 19, 2005, and appellants' petition for review by the Supreme Court was denied September 21, 2005. George, C. J., did not participate therein.

---

[20] Because appellants have failed to articulate reasons for not submitting the documents attached to their request for judicial notice to the trial court, and based on the analysis we adopt in rejecting appellants' claims of error, which renders that request irrelevant, we deny appellants' request for judicial notice.