Filed 2/23/24 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| COUNTY OF ALAMEDA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALAMEDA COUNTY TAXPAYERS'<br>ASSOCIATION, INC. et al.,<br><br>    Defendants and Appellants. | A166401<br><br>(Alameda County<br>Super. Ct. No. RG20070099) |
| ALAMEDA COUNTY TAXPAYERS'<br>ASSOCIATION, INC. et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>COUNTY OF ALAMEDA et al.,<br><br>    Defendants and Respondents. | A166404<br><br>(Alameda County<br>Super. Ct. No. RG20070495)<br><br>**ORDER DENYING<br>APPELLANTS' PETITION<br>FOR REHEARING AND<br>MODIFYING OPINION**<br><br>**[NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

Appellants' petition for rehearing is DENIED. The opinion filed on January 29, 2024, shall be MODIFIED as follows:

    1. On page two, the first paragraph in Background section A. is modified to read: Two years before Measure C's

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion sections A., C., and E.-G.

1

adoption, the Alameda County Board of Supervisors adopted an ordinance submitting Measure A—a 30-year, one-half percent sales tax to fund childcare and early education—for voter approval. At the June 2018 election, Measure A failed to receive the two-thirds voter approval that it needed to pass. About a month later, the board considered adopting a slimmed down version—a 20-year, one-half percent sales tax—subject to two-thirds voter approval at the November 2018 election. The board tabled that proposal at a meeting where two supervisors discussed the possibility of "a signature gathering campaign for the 2020 election," which might be subject to a lower approval threshold.

2. On page three, the final sentence of the first partial paragraph is modified to read: The record includes evidence that Brown served on the campaign committee in his individual capacity, using paid leave and vacation time.

3. On page 10, the final sentence of footnote 6 is modified to read: Because we reject this approach, we have no reason to consider whether any public official or public employee breached any rules and accordingly limit our recitation of the facts.

4. On page 16, the first paragraph of subsection "2." is modified to read: The question is whether Measure C violates article II, section 12 by granting a specific "name[d] or identifie[d]" private corporation a function, power, or duty that gives it a special privilege or advantage. (See *Calfarm, supra*, 48 Cal.3d at pp. 832, 834; *Tain v. State Bd. of Chiropractic Examiners* (2005) 130 Cal.App.4th 609, 633-634 (*Tain*).) We agree with the county that it does not.

5. At page 16, the second paragraph of subsection "2." is modified to read: Children's Hospital Oakland is named in Measure C's findings, which describe it as a critical provider of pediatric care in the community without assigning it any function, power, or duty. Simply naming

2

a specific private corporation does not violate article II, section 12. (See *Tain, supra,* 130 Cal.App.4th at pp. 632-634.)

6. On page 17, the first full paragraph is modified to read: The italicized language imposes a duty on the *board* to consult with multiple experts, including the local pediatric hospital, before spending revenue from the Pediatric Health Care Account. The experts themselves have only a passive role as consultees with no duties and no authority to make decisions—not even an obligation to answer the phone when the board calls. We are not troubled by this passive consultation role. (Compare *Tain, supra,* 130 Cal.App.4th at pp. 632-633 with *Pala Band, supra,* 54 Cal.App.4th at pp. 584-585, 591 [initiative violated article II, section 12 when it imposed duties on named private developer to determine and prepare a site plan, secure permits, and consult with various agencies].)

7. On page 17, add two new paragraphs after the first full paragraph that read: *Tain* is instructive on this point. In *Tain*, an initiative gave the State Board of Chiropractic Examiners the power to approve chiropractic schools that had been accredited by a named private entity, among others. (*Tain, supra,* 130 Cal.App.4th at p. 632.) The named private entity performed a consulting or screening role—the State Board could only approve schools that had been accredited by the private entity or other accrediting agencies. The court held, however, that this role conferred no special privilege on the named private entity within the meaning of section 12 for several reasons: other entities could also grant accreditations, the named private entity itself was not *required* to grant accreditations (or do anything at all), and the State Board retained the authority to reject schools that the named entity had accredited. (*Tain, supra,* at pp. 632-633.)

So too here. The County board of supervisors must consult with other experts in addition to the Children's Hospital Oakland, the hospital itself is not required to

3

consult with the board of supervisors (or do anything at all), and the board of supervisors retains the authority to reject advice that the hospital or other experts provide.

8. On page 17, what was originally the second full paragraph is modified to read: Given that a primary objective of Measure C is to support "a local Level 1 pediatric trauma center" and to "maint[ain] and expan[d] . . . specialized staff and facilities . . . [to treat] complex illnesses and conditions," it is impossible to imagine that the board would not consult the trauma center and other health care experts when deciding how to spend the revenue Measure C raises. As a matter of good governance and fiscal prudence, the board would presumably consult with them regardless of whether Measure C required it to do so. The Association fails to persuade us that this is the kind of special privilege that article II, section 12 was intended to proscribe. (See *Calfarm, supra,* 48 Cal.3d at pp. 832-833 [discussing legislative history]; *Tain, supra,* 130 Cal.App.4th at pp. 632-633.)

9. Footnote seven on page 18 (of the original opinion before the new paragraphs in item seven were inserted) should be moved up to the conclusion of the modified paragraph in point 8 above. Footnote seven is modified to read: The Association also observes that the board may use some of Measure C's revenue to support the services Children's Hospital Oakland provides to the community as it is undisputedly the only existing "Level 1 pediatric trauma center" in the county. This potential, nonexclusive benefit to the hospital (§§ 2.08.301-2.08.302) does not appear to be a duty, power, or function proscribed by article II, section 12. Moreover, by identifying Children's Hospital Oakland in the findings, Measure C provided the voters important information about where some of their tax money may be spent. It is hard to see how withholding this information would serve the underlying constitutional purpose of article II, section 12. (See *Calfarm, supra*, 48 Cal.3d at pp. 832-833.) In any event, the Association offers no coherent argument or authority

4

to support the position that this potential benefit is a function, power, or duty proscribed by that provision. Thus, we do not address it further. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)

10.    Delete the entire paragraph originally at the bottom of page 17, which continues onto page 18 (of the original opinion before the new paragraphs in item seven above were inserted) that begins: Finally, Measure C's section 2.08.302 was carefully drafted to avoid naming a specific private corporation . . .

11.    The final paragraph of subsection D. (that originally began at the bottom of page 18 and continued onto page 19) is modified to read: Because the Association has not shown that the initiative " 'clearly, positively, and unmistakably' " violates article II, section 12 (*Rossi, supra,* 9 Cal.4th at p. 711), we must uphold Measure C. (*Calfarm, supra,* 48 Cal.3d at pp. 814-815.)

12.    On the last page of the opinion (originally page 26), add a new final paragraph before the "Disposition" that reads: We need not address arguments that the Association first raises in its reply brief, such as its argument that Measure C violates Revenue and Taxation Code section 7285.5. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4.)

The modifications make no change to the judgment.

BURNS, J.

WE CONCUR:

JACKSON, P. J.
CHOU, J.

*County of Alameda v. Alameda County Taxpayers' Association, Inc. et al.* (A166401)
*Alameda County Taxpayers' Association, Inc. et al. v. County of Alameda et al.* (A166404)

5

Alameda County Superior Court, Nos. RG20070099 and RG20070495, Hon. Jeffrey S. Brand.

Law Offices of Jason A. Bezis and Jason A. Bezis for Defendants and Appellants in No. A166401 and for Plaintiffs and Appellants in No. A166404.

Jonathan M. Coupal, Timothy A. Bittle and Laura E. Dougherty for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Defendants and Appellants in No. A166401 and Plaintiffs and Appellants in No. A166404.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, John A. Abaci and Conor W. Harkins for Plaintiff and Respondent in No. A166401 and for Defendants and Respondents in No. A166404.

Filed 1/29/24 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| COUNTY OF ALAMEDA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ALAMEDA COUNTY TAXPAYERS' ASSOCIATION, INC. et al., <br><br> Defendants and Appellants. | A166401 <br><br><br> (Alameda County <br> Super. Ct. No. RG20070099) |
| ALAMEDA COUNTY TAXPAYERS' ASSOCIATION, INC. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF ALAMEDA et al., <br><br> Defendants and Respondents. | A166404 <br><br><br> (Alameda County <br> Super. Ct. No. RG20070495) |

In these consolidated appeals, the Alameda County Taxpayers' Association, Inc., Marcus Crawley, Thomas Rubin, Steve Slauson, and Montclair Village Hardware (collectively, the Association) appeal from the trial court's judgments, which rejected the Association's attempt to invalidate a citizen's tax initiative (Measure C) to fund early childhood education and pediatric health care in Alameda County. At the March 3, 2020 primary election, Measure C was approved by a simple majority of county voters. The Association contends that the trial court

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion sections A., C., and E.-G.

1

erroneously rejected its numerous challenges to Measure C, including its argument that the tax initiative required the approval of two-thirds of the voting electorate, pursuant to Proposition 13 (Cal. Const., art. XIII A, § 4)[1] and Proposition 218 (art. XIII C, § 2, subd. (d)).

In the published portion of this opinion, we reject that argument and, additionally, conclude that Measure C does not violate article II, section 12 by "nam[ing] or identif[ying] any private corporation to perform any function or to have any power or duty." In the unpublished portion of this opinion, we reject the Association's remaining challenges. Finding no error, we affirm.

## BACKGROUND

### A.

Two years before Measure C's adoption, the Alameda County Board of Supervisors placed a similar measure on the ballot, Measure A, which sought voter approval of a 30-year, one-half percent sales tax to fund childcare and early education. At the June 2018 election, Measure A failed to receive the two-thirds voter approval that it needed to pass. About a month later, the board considered adopting a slimmed down version—a 20-year, one-half percent sales tax—subject to two-thirds voter approval at the November 2018 election. The board tabled that proposal.

Soon after, a voter initiative emerged, with support from a county official and a county employee. In August 2019, the county's Registrar of Voters received a "Notice of Intention to Circulate Petition" for a proposed citizens' initiative, which recommended a 20-year, one-half percent sales tax to fund childcare and pediatric health care. The notice was signed by five proponents, including Wilma Chan, who was a supervisor on the board at the time. Dave Brown, who also served as Chan's chief

---

[1] Undesignated article references are to the California Constitution.

2

of staff, was the principal officer of the campaign committee proposing the initiative. The county submitted evidence that Brown served on the campaign committee in his individual capacity, using vacation time.

After receiving an initiative petition signed by 86,513 voters, the registrar certified that the requisite number of valid signatures had been received to qualify the proposed initiative for the ballot (Elec. Code, §§ 9113-9115, 9118).[2] The board placed the initiative on the ballot for the March 3, 2020 primary election (§§ 1405, subd. (a), 9118, subd. (b)).

According to the official voter information guide, Measure C sought a vote on the following: "Alameda County Care for Kids. To improve critical early health and education for Alameda County children by: protecting local childrens' [*sic*] healthcare safety net and Level 1 Pediatric Trauma Center; and increasing access to high quality, affordable childcare and preschool to improve kindergarten readiness, school success and high school graduation rates; shall a County of Alameda ordinance enacting a 20-year half-percent sales tax providing approximately $150,000,000 annually with citizens' oversight and mandatory annual audits be adopted?" The guide also included an impartial analysis of Measure C, written by County Counsel, as well as an argument in its favor. No argument against the measure was submitted.

The guide included the full text of Measure C. Section 2 sets out the electorate's findings, including that "[e]arly education and health care are two of the important components" in ensuring the health and success of children; that "[a] child's health and educational advancement are essential and dependent on one another"; that only 31 percent of the county's children

---

[2] Undesignated statutory references are to the Elections Code.

3

with working parents had access to licensed child care, preschool, or other early education; and that, in 2017, only 44 percent of the county's children entering kindergarten were ready. Section 3 states that the purpose and intent of the measure is "to ensure that Alameda County children receive the high quality early education and health care they need to be successful adults." Enactment of the tax, its implementation and collection, along with the use of proceeds, are governed by additional provisions of the ordinance, which we discuss in more detail below.

Measure C passed with more than 64 percent of the votes.

## B.

Following the election, the county filed an action to validate Measure C. (Code Civ. Proc., § 860 et seq.; Rev. & Tax. Code, § 7270.5.) Only the Association responded to the summons. The Association also filed its own reverse validation action, under Code of Civil Procedure section 863, contending Measure C was invalid under various theories.

After a joint hearing on the merits of the related actions, the trial court rejected each of the Association's arguments, concluded Measure C was valid, and entered judgments in the county's (and its registrar's) favor.

## DISCUSSION

## A.

To start, we disagree with the county that the Association's appeals are untimely.

A notice of appeal in an action filed under the validation statutes must be filed "within 30 days after the notice of entry of the judgment." (Code Civ. Proc., § 870, subd. (b); *Davis v. Mariposa County Bd. of Supervisors* (2019) 38 Cal.App.5th 1048, 1051-1052, 1055.) Although it is undisputed that the Association filed its two notices of appeal (one in each of the actions) within

4

30 days of service of the notices of entry of judgment, the county moved to dismiss the appeals as untimely.[3]

In its motion, the county argues that the 30-day time limit began running months earlier when it served a "notice of entry" of the written order after hearing—in which the trial court rejected all the Association's claims. We originally deferred ruling on the motion to dismiss but now deny it.

The question is whether the written order after hearing constitutes a final judgment, which is to be determined from its substance rather than its label. (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 698.) A final judgment completely disposes of the matter in controversy and leaves no further action—such as preparation of another order or judgment—for the trial court. (See Code Civ. Proc., §§ 577, 904.1, subd. (a)(1); *Griset, supra*, at p. 698; *Laraway v. Pasadena Unified School Dist.* (2002) 98 Cal.App.4th 579, 583-584.)

Here, the written order after hearing did not provide a final determination of the parties' rights. The first paragraph states, "judgment is *to be* entered in [the County's] favor." (Italics added.) Thus, the order contemplated further action—the subsequent preparation and entry of judgment—and the 30-day period is properly calculated from that later date. (Code Civ. Proc., § 870; cf. *Laraway v. Pasadena Unified School Dist., supra,* 98 Cal.App.4th at pp. 581-582 [order that resolved all issues between parties and that "did not contemplate nor direct the preparation of any further order or judgment" was appealable final judgment].) The motion to dismiss is denied.

_____

[3] The motion to dismiss was filed before the appellate record and both the county and the Association filed requests for judicial notice to support their moving and opposition papers. However, because all the relevant documents establishing our jurisdiction are now found in the appellate record, the requests for judicial notice are denied as unnecessary.

**B.**

The Association insists that the tax imposed by Measure C violates the state constitution—specifically Proposition 13 (art. XIII A, § 4) and Proposition 218 (art. XIII C, § 2, subd. (d))—because it was not approved by a two-thirds vote of the electorate.  After independently reviewing the trial court's construction of constitutional provisions (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 934 (*California Cannabis*)), we reject the Association's argument.

**1.**

Under our state constitution, "the people reserve to themselves the powers of initiative and referendum."  (Art. IV, § 1.)  Voters may use the initiative power to enact legislation at the state, county, and city levels.  (*Ibid.*; art. II, §§ 8, 11, subd. (a).)  "A defining characteristic of the initiative is the people's power to adopt laws by majority vote."  (*City and County of San Francisco v. All Persons Interested in Matter of Proposition C* (2020) 51 Cal.App.5th 703, 709 (*Proposition C*); accord, art. II, § 10, subd. (a); § 9122.)

Our Supreme Court affords "extraordinarily broad deference" to the electorate's power to enact laws by initiative. (*Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565, 573-574 (*Pala Band*); accord, *California Cannabis, supra,* 3 Cal.5th at pp. 934-936; *Rossi v. Brown* (1995) 9 Cal. 4th 688, 695, 711 (*Rossi*).)  California courts have a duty to " ' " jealously guard" ' " the voters' exercise of their initiative power, and courts must therefore liberally construe the initiative right, "resolve doubts in favor of [its] exercise . . . whenever possible," and "narrowly construe provisions that would burden or limit the exercise of that power."  (*California Cannabis, supra,* at pp. 934, 936.)

6

There are "precious few limits" on the initiative power. (*California Cannabis*, *supra*, 3 Cal.5th at p. 935.) By design, the initiative power is intended to circumvent the ordinary legislative process. (*Id*. at p. 934.) Procedural requirements imposed on state and local governments do not apply to initiatives unless there is unambiguous evidence that they were so intended. (*Id*. at pp. 935, 945-947.) This includes the procedural requirements that Propositions 13 and 218 added to our constitution. (See *California Cannabis*, at pp. 935, 948; *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 251-253 (*Kennedy Wholesale*).)

Two such requirements are at issue here. Proposition 13 added article XIII A, section 4, which provides (in relevant part): "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district." Proposition 218 added article XIII C, section 2, subdivision (d): "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two–thirds vote."[4]

Our Supreme Court has examined related provisions of Propositions 13 and 218 and concluded that they apply to taxes imposed by local government (or the state legislature) but not to taxes imposed by voter initiative. (*California Cannabis, supra*, 3 Cal.5th at pp. 931, 936 [art. XIII C, § 2, subd. (b)'s restriction on local government tax increases does not limit voters' power to raise taxes by initiative]; *Kennedy Wholesale, supra*, 53 Cal.3d at pp. 248-249, 251, 253 [art. XIII A, § 3's supermajority requirement for taxes enacted by state legislature does not limit voters' initiative power to raise taxes by majority vote].) In

_____

[4] A special tax is one that earmarks or dedicates its proceeds to a specific purpose. (*Bay Area Cellular Telephone Co. v. City of Union City* (2008) 162 Cal.App.4th 686, 696; accord, art. XIII C § 1, subd. (d).) It is undisputed that Measure C qualifies.

7

*California Cannabis,* the court explained that a "contrary conclusion would require an unreasonably broad construction of the term 'local government' at the expense of the people's constitutional right to direct democracy, undermining our longstanding and consistent view that courts should protect and liberally construe it." (*California Cannabis, supra,* at p. 931; see *id.* at p. 945.) A local tax enacted by voter initiative is not a tax "impose[d]" by "local government" within the meaning of Proposition 218.[5] (*Id.* at pp. 943-944.)

Following *California Cannabis*, the California appellate courts have uniformly concluded that the supermajority requirements applicable to special taxes imposed by local government (art. XIII A, § 4; art. XIII C, § 2, subd. (d)) do not limit the electorate's initiative power. (*Alliance San Diego v. City of San Diego* (2023) 94 Cal.App.5th 419, 430-434, review den. Nov. 21, 2023, S281846 (*Alliance San Diego*); *City and County of San Francisco v. All Persons Interested in the Matter of Proposition G* (2021) 66 Cal.App.5th 1058, 1070, 1075 (*Proposition G*); *Howard Jarvis Taxpayers Assn. v. City and County of San Francisco* (2021) 60 Cal.App.5th 227, 230-237, review den. April 28, 2021, S267516 (*Howard Jarvis*); *City of Fresno v. Fresno Building Healthy Communities* (2020) 59 Cal.App.5th 220, 226, 235-236, review den. Mar. 30, 2021, S266846; *Proposition C, supra,* 51 Cal.App.5th at pp. 708-709, 721, 724, review den. Sept. 9, 2020, S263753.)

We agree that, if a local special tax is imposed via citizens' initiative, only a simple majority vote is required to adopt it.

---

[5] Proposition 218 provides a single definition of local government: " 'Local government' means any county, city, city and county, including a charter city or county, any special district, or any other local or regional governmental entity." (Art. XIII C, § 1, subd. (b).)

(*Proposition G, supra*, 66 Cal.App.5th at p. 1070; *Howard Jarvis, supra,* 60 Cal.App.5th at p. 237; § 9122.)

**2.**

The Association acknowledges that the foregoing rule is settled but argues that the cases listed above are distinguishable. Those cases, it says, involved bona fide citizens' initiatives, while Measure C—due to the involvement of a board supervisor and her chief of staff—was merely a " 'quasi-initiative' " masquerading as a voters' initiative. It asks us to declare that, when an initiative campaign is "effectively controlled" by local government in " 'intentional circumvention' " of Propositions 13 and 218, the tax was enacted by local government, not by voter initiative, and thus subject to the two-thirds vote requirement. This Division rejected a similar argument in *Howard Jarvis, supra,* 60 Cal.App.5th at pages 239-242. The Association asks us to reconsider that decision. We have taken a fresh look at the issue, but we remain unpersuaded.

First, the Association, rather cavalierly, is asking us to annul a voter initiative by judicial fiat. Measure C *was* enacted by voter initiative, not by the board. (See *California Cannabis, supra*, 3 Cal.5th at pp. 934-935, 945 [distinguishing between taxes enacted by initiative and taxes enacted by local government]; see also *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 175, fn. 7, 187-190 (*Sierra Madre*) [distinguishing between city council-generated initiatives (also known as referenda) and voter-sponsored initiatives].) It was placed on the ballot by voter petition and approved at the March 2020 election by a majority of voters. (See §§ 9118, subd. (b), 9122.) We cannot ignore reality.

The Association makes no serious attempt to explain how we can set aside the votes of 287,027 people (more than 64 percent of total votes cast) while honoring our duty to " ' "jealously guard" ' " the voters' exercise of their initiative

power, liberally construe the initiative right, and "resolve doubts in favor of [its] exercise . . . whenever possible." (*California Cannabis, supra,* 3 Cal.5th at p. 934.) Nor does it explain how a court can declare—consistent with separation of powers principles (art. III, § 3; *City Council v. Superior Court* (1960) 179 Cal.App.2d 389, 394-396)—that a county's board of supervisors enacted a specific tax measure that, in fact, it never voted to enact. (See *Rose v. County of San Benito* (2022) 77 Cal.App.5th 688, 716 ["a county acts only through its board of supervisors;" individual officer cannot alone exercise legislative function].) Because Measure C was imposed by voter initiative, the tax was not "impose[d]" by local government within the meaning of Proposition 13 and Proposition 218, and the supermajority rules do not apply.[6] (See art. XIII A, § 4; art. XIII C, § 2, subd. (d); *California Cannabis, supra,* at pp. 943-944; *Howard Jarvis, supra*, 60 Cal.App.5th at pp. 231, 237-239.)

Second, *Rider v. County of San Diego* (1991) 1 Cal.4th 1 (*Rider*)—which the Association relies on as authority for judicially declaring Measure C to be a special tax imposed by local government, rather than by initiative–has nothing to do with initiatives. The *Rider* court considered whether Proposition 13 (art. XIII A, § 4) applied to a special tax imposed by a regional

---

[6] To be sure, there are important limits on the degree to which public officials may advocate for, or expend public resources on, a voter initiative. (See, e.g., *Stanson v. Mott* (1976) 17 Cal.3d 206, 223; *League of Women Voters v. Countywide Crim. Justice Coordinating Com.* (1988) 203 Cal.App.3d 529, 548-550.) But the Association is not seeking relief on these grounds. Its purpose, instead, is to invalidate the election result by reclassifying the initiative as a local government enactment, thereby making Proposition 13's and Proposition 218's supermajority requirements applicable. Because we reject this approach, we have no reason to consider whether any public official breached any rules.

financing agency. (*Rider*, *supra*, at p. 5.) The case primarily turns on whether the agency was a "special district" under article XIII A, section 4. The agency had been transparently designed to evade Proposition 13 by taking advantage of an earlier Supreme Court case that narrowly construed the term "special district." (*Rider* at pp. 9-10; see *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197, 205-206.) The *Rider* court recognized that *Richmond* had created a loophole, revisited the issue (*Rider, supra,* at pp. 10-11), and concluded that the "framers of Proposition 13, and the voters who adopted it" intended a broader definition of "special district." (*Id.* at p. 11.)

*Rider* is inapposite. Proposition 13 expressly applies to special districts. (Art. XIII A, § 4.) So the *Rider* court's holding— that the special district at issue must comply with Proposition 13—fits squarely within the language and intent of the constitutional language. (*Rider, supra*, 1 Cal.4th at p. 11.) But our case concerns a voter initiative, and the courts have uniformly concluded that the language and intent of Propositions 13 and 218 do not apply to voter initiatives. (See, e.g., *Proposition C, supra,* 51 Cal.App.5th at pp. 708-709, 721, 724.) *Rider* does not cast doubt on those cases, much less give us license to invalidate an initiative. We thus stand by our conclusion in *Howard Jarvis*: *Rider* does not apply because "neither the text nor ballot materials provide the requisite 'unambiguous indication' that the enactors of Propositions 13 and 218 intended to constrain the initiative power when an official is involved in the initiative process." (*Howard Jarvis, supra,* 60 Cal.App.5th at p. 242, citing *California Cannabis, supra*, 3 Cal.5th at pp. 945-946; see *Proposition G, supra*, 66 Cal.App.5th at pp. 1079-1081 [following *Howard Jarvis*].)

We acknowledge that our colleagues in the Fourth District, citing *Rider*, recently suggested that "too much government involvement" could potentially "convert a voter [tax] initiative

11

into a local government initiative." (*Alliance San Diego, supra,* 94 Cal.App.5th at pp. 447-448.) For the reasons stated above, we disagree.

We need not address the Association's related discovery and pleading arguments.

## C.

The Association also contends that Measure C violates the single-subject rule. We disagree.

## 1.

The single-subject rule refers to article II, section 8, subdivision (d), which provides: "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." The rule applies to both local and statewide initiatives (*Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1255) and is intended to minimize the risk of voter confusion and deception. (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1156.) However, because " 'the initiative process occupies an important and favored status in the California constitutional scheme,' " the rule " 'should not be interpreted in an unduly narrow or restrictive fashion that would preclude the use of the initiative process to accomplish comprehensive, broad-based reform in a particular area of public concern.' " (*Briggs v. Brown* (2017) 3 Cal.5th 808, 828 (*Briggs*).)

There are two tests for measuring compliance with the single-subject rule. (*One Technologies, LLC v. Franchise Tax Bd.* (2023) 96 Cal.App.5th 748, 760 (*One Technologies*).) Under the first, courts will uphold an initiative measure if its component provisions are " 'reasonably germane' " to a common theme or purpose. (*Briggs, supra,* 3 Cal.5th at p. 829, italics omitted; *One Technologies, supra,* at p. 760.) Yet the common purpose to which the initiative's various provisions relate cannot be " 'so broad that

12

a virtually unlimited array of provisions could be considered germane,' " which would " 'essentially obliterat[e] the constitutional requirement.' " (*Senate of the State of Cal. v. Jones, supra,* 21 Cal.4th at p. 1162; *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 253 [rule "forbids joining disparate provisions which [are] germane only to topics of excessive generality such as 'government' or 'public welfare' "].)

Under the second test, an initiative complies with the single-subject rule if its provisions are "functionally related to one another." (*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1100.) We are obligated to resolve any reasonable doubts in favor of the people's initiative right. (*Brosnahan v. Brown, supra,* 32 Cal.3d at p. 241.)

**2.**

The Association does not challenge Measure C's own findings that its education and health care provisions are functionally related—because outcomes in both areas are interdependent. Rather, it argues that there is no common theme because *some* revenue may be spent on health care for young adults.

Proceeds from the tax must be deposited into a special fund, comprised of two accounts, that may be used to support pediatric health care, childcare, and early education. The revenue deposited in the "Child Care, Preschool, and Early Education Account" fund will support childcare and early education services for "low- and middle-income *children from birth to age twelve.*" (Italics added.) The revenue deposited in the "Pediatric Health Care Account" will be spent to (1) "maintain, upgrade, and expand . . . a Level 1 pediatric trauma center in Alameda County"; (2) "assure the financial viability of the local children's health care safety net and its accessibility, including the maintenance and expansion of specialized staff and facilities that provide board certified pediatric and pediatric

13

subspeciality care . . . for *children and young adults* without regard to insurance status or their ability to pay;" and (3) "implement innovative programs that enable *pediatric and young adult patients* and their families to better access pediatric health care services."  (Italics added.)

The Association maintains that Measure C thus promotes not only early childhood education but—because young adults and children 12 years old and younger are necessarily different groups—also health programs that are *not* aimed at improving early education outcomes.  Therefore, they argue that Measure C has no common theme.

The Association's approach is too strict.  Measure C's provisions are united by the common goal of "ensur[ing] that Alameda County children receive the high quality early education and health care they need to be successful adults." This goal is not so broad that accepting it would essentially negate the constitutional requirement.  (See *California Assn. of Retail Tobacconists v. State of California* (2003) 109 Cal.App.4th 792, 811-812.)  And funding health care for young adults—who are in the transition period from childhood to adulthood that Measure C explicitly seeks to enhance— is reasonably germane to the initiative's purpose.  At most, allowing some funding to support health care for young adults would be a collateral effect of the initiative, which is permissible.  (*Kennedy Wholesale, supra,* 53 Cal.3d at pp. 254-255; see also, *One Technologies, supra,* 96 Cal.App.5th at pp. 762-763.)

Ultimately, the Association disagrees with Measure C's strategy.  We know of no reason that the people (in their legislative role) cannot decide that health care is important enough to a child's developmental success—on both the individual and intergenerational level—to fund throughout the child's development into adulthood.  It is not the courts' role to question an initiative's economic or social wisdom.  (*Briggs,*

14

*supra*, 3 Cal.5th at p. 828.)  We reject the notion that the single-subject rule requires Measure C to set uniform age limits across the entirety of its spending provisions.

## D.

Next, the Association argues that Measure C is unconstitutional because its findings identify a private corporation, UCSF Benioff Children's Hospital, Oakland (Children's Hospital Oakland), in violation of article II, section 12.  This argument also lacks merit.

## 1.

Article II, section 12 provides:  "No amendment to the Constitution, and no statute proposed to the electors by the Legislature or by initiative, that names any individual to hold any office, or *names or identifies any private corporation to perform any function or to have any power or duty*, may be submitted to the electors or have any effect."  (Italics added.)

This constitutional prohibition was "enacted to prevent the initiative [power] from being used to confer special privilege or advantage on specific persons or organizations."  (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 832 (*Calfarm*).)  It applies equally to both "for profit" corporations and to " 'nonprofit public benefit corporation[s]' " (*id.* at pp. 833-834), such as the Children's Hospital Oakland.  Article II, section 12's prohibition also applies to county initiatives, just as it does to state initiatives.  (*Pala Band, supra,* 54 Cal.App.4th at pp. 579-583.)

An initiative measure " 'must be upheld unless [its] unconstitutionality clearly, positively, and unmistakably appears.' "  (*Rossi, supra*, 9 Cal.4th at p. 711.)  "If the validity of the measure is 'fairly debatable,' it must be sustained."  (*Calfarm, supra,* 48 Cal.3d at p. 815.)  When a portion of an initiative violates article II, section 12 but is severable, "the rule is clear:

15

the offending part must be stricken from the initiative, and the remainder may take effect." (*Calfarm,* at p. 836.)

**2.**

The question is whether Measure C violates article II, section 12 by granting a specific "name[d] or identifie[d]" private corporation an exclusive privilege or role that is superior to others. (See *Calfarm, supra*, 48 Cal.3d at pp. 832, 834; *Tain v. State Bd. of Chiropractic Examiners* (2005) 130 Cal.App.4th 609, 633-634.) We agree with the county that it does not.

Children's Hospital Oakland is named in Measure C's findings, which describe it as a critical provider of pediatric care in the community without assigning it any function, power, or obligation.

The Association focuses on section 2.08.302 A. of the measure, which explains how the board can spend revenue and refers to the "local pediatric hospital": "In each year during the term of this article, *the board of supervisors shall, in consultation with the local pediatric hospital and specialty provider representatives*, expend monies from the Pediatric Health Care Account based on demonstrated need for any of [three pediatric health care related] purposes," including "[t]o maintain, upgrade, and expand, as needed, a Level 1 pediatric trauma center in Alameda County" and "[t]o assure the financial viability of the local children's health care safety net." (Italics added.) Section 2.08.302 B. continues: "*Monies from the Pediatric Health Care Account may be expended* for the purposes set forth herein as direct grants, as contractual or program payments for services and activities, as the nonfederal share of Medicaid payments or other federal program payments through certified public expenditures or intergovernmental transfers, as reimbursement or other compensation for costs, as incentives, or *through programs or other vehicles identified or developed in conjunction*

16

*with the local pediatric hospital and specialty provider representatives.*" (Italics added.)

The italicized language imposes a duty on the *board* to consult with multiple experts, including the local pediatric hospital, before spending revenue from the Pediatric Health Care Account. The experts themselves have only a passive role as consultees with no duties and no authority to make decisions— not even an obligation to answer the phone when the board calls. (Cf. *Pala Band, supra,* 54 Cal.App.4th at pp. 584-585, 591 [initiative violated article II, section 12 when it imposed duties on named private developer to determine and prepare a site plan, secure permits, and consult with various agencies].)

We are not troubled by the passive consultation role. Given that a primary objective of Measure C is to support "a local Level 1 pediatric trauma center" and to "maint[ain] and expan[d] . . . specialized staff and facilities . . . [to treat] complex illnesses and conditions," it is impossible to imagine that the board would not consult the trauma center and other health care experts when deciding how to spend the revenue Measure C raises. As a matter of good governance and fiscal prudence, the board would presumably consult with them regardless of whether Measure C required it to do so. The Association fails to persuade us that this is the kind of special privilege that article II, section 12 was intended to proscribe. (See *Calfarm, supra,* 48 Cal.3d at pp. 832-833 [discussing legislative history].)

Finally, Measure C's section 2.08.302 was carefully drafted to avoid naming a specific private corporation in any exclusive role (*Calfarm, supra,* 48 Cal.3d at pp. 832, 834), instead using the generic terms "the local pediatric hospital and specialty provider representatives." The former term is undefined. As noted, separate findings name Children's Hospital Oakland without assigning it any function, power, or duty. We agree that, as a matter of logic, they can be linked. But because the initiative

17

keeps them separate, if the hospital is sold during the 20-year life of the tax, Measure C would require the board to consult with (among other experts) the new owners, not Children's Hospital Oakland. (See *Hernandez v. Town of Apple Valley* (2017) 7 Cal.App.5th 194, 211, 213 [finding no article II, section 12 violation where initiative referred to Walmart generically as "developer" or "owner" and gave it no rights superior to others if it sold the property].) Article II, section 12, bars an initiative from assigning functions, powers, and duties to a specific corporation, not a generic owner or developer. (See *Hernandez, supra,* at pp. 211, 213; *Pala Band, supra,* 54 Cal.App.4th at p. 587 & fn. 22 [striking definition of " '[a]pplicant' " that named a specific private developer but leaving generic references to " '[a]pplicant' " to whom the initiative assigned functions, powers, and duties].) [7]

The Association fails to meet its burden to show that the initiative " 'clearly, positively, and unmistakably' " violates article II, section 12. (*Rossi, supra,* 9 Cal.4th at p. 711.) Therefore we

---

[7] The Association also observes that some of the revenue from Measure C will support the services Children's Hospital Oakland provides to the community as it is undisputedly the only existing "Level 1 pediatric trauma center" in the county. This nonexclusive benefit (§§ 2.08.301-2.08.302) does not appear to be a duty, power, or function proscribed by article II, section 12. Moreover, by identifying Children's Hospital Oakland in the findings, Measure C provided the voters important information about where some of their tax money will be spent. It is hard to see how withholding this information would serve the underlying constitutional purpose of article II, section 12. (See *Calfarm, supra,* 48 Cal.3d at pp. 832-833.) In any event, the Association offers no coherent argument or authority to support the position that this benefit is a function, power, or duty proscribed by that provision. Thus, we do not address it further. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)

must uphold Measure C.  (*Calfarm, supra*, 48 Cal.3d at pp. 814-815.)

## E.

The Association next argues that imposition of Measure C's tax would violate Revenue and Taxation Code section 7251.1, which provides: "The combined rate of all [transactions and use] taxes imposed . . . in any county may not exceed 2 percent.  No tax shall be considered to be in accordance with this part if, upon its adoption, the combined rate in the county will exceed 2 percent."  The Association fails to meet its burden to show error on appeal.

In rejecting the same argument below, the trial court explained that the Association failed to account for the application of Revenue and Taxation Code section 7292.2, subdivision (b).  Subdivision (a) of that statute provides: "Notwithstanding any other law, the County of Alameda may impose a transactions and use tax for general or specific purposes to support countywide programs at a rate of no more than 0.5 percent that would, in combination with all taxes imposed in accordance with the Transactions and Use Tax Law . . . , *exceed the limit established in Section 7251.1, if all of the following requirements are met*: [¶] (1) The county adopts an ordinance proposing the transactions and use tax by any applicable voting approval requirement. [¶] (2) The *ordinance proposing the transactions and use tax is submitted to the electorate and is approved by the voters voting on the ordinance pursuant to Article XIIIC . . . .* [¶] (3) The transactions and use tax conforms to the Transactions and Use Tax Law . . . , other than Section 7251.1."  (Rev. & Tax. Code, § 7292.2, subd. (a), italics added.)

Since January 1, 2020, subdivision (b)(1) of the very same statute has provided:  "*Notwithstanding Section 7251.1, neither of the following shall be considered for purposes of the rate limit* established by that section: [¶] (A) A transactions and use tax

19

rate imposed pursuant to subdivision (a). [¶] (B) *A transactions and use tax rate imposed by the County of Alameda pursuant to authority previously granted by Chapter 327 of the Statutes of 2011, as amended by Chapter 194 of the Statutes of 2013*." (Rev. & Tax. Code, § 7292.2, subd. (b)(1), as amended by Assem. Bill No. 723 (2019-2020 Reg. Sess.), Stats. 2019, ch. 747, § 3, eff. Jan. 1, 2020, italics added.) "This subdivision does not constitute a change in, but is declaratory of, existing law." (*Id.*, subd. (b)(2).)

The Association appears to assume the imposition of Measure C's one-half percent tax would have exceeded the two percent cap set by Revenue and Taxation Code section 7251.1— thus requiring Measure C to comply with Revenue and Taxation Code section 7292.2, subdivision (a), to exempt itself from the cap. In support, the Association cites only a chart prepared by California's Department of Tax and Fee Administration, which lists the name, rate, and effective date of various taxes imposed within Alameda County. However, the county correctly points out that, because of the passage of Assembly Bill No. 723, certain taxes are not counted towards the two percent limit. (Rev. & Tax. Code, § 7292.2, subd. (b); Pub. Util. Code, § 29140.)

The Association has not met its burden on appeal. We cannot assume that the two percent limit applies to all the taxes listed in the chart. Because the Association fails to point us to anything in the record establishing otherwise, we must presume that the trial court correctly determined that the additional one-half percent to be imposed by Measure C implicates neither Revenue and Taxation Code section 7251.1 nor Revenue and Taxation Code section 7292.2, subdivision (a). (See *Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443 [appellant bears burden of affirmatively demonstrating error]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

20

## F.

Implicitly recognizing that our Legislature granted Alameda County relief from the two percent limit, in Senate Bill No. 703 and Assembly Bill No. 723, the Association attacks those statutes as unconstitutional special legislation. The argument lacks merit.

Article IV, section 16 provides: "(a) All laws of a general nature have uniform operation. [¶] (b) A local or special statute is invalid in any case if a general statute can be made applicable." "[A]rticle IV, section 16 does *not* prohibit the Legislature from enacting statutes that are applicable solely to a particular county or local entity." (*White v. State of California* (2001) 88 Cal.App.4th 298, 305, italics added.) In determining whether a general statute can be made applicable, the focus is whether there is *any* " 'rational relationship' " between the purpose of the statute and the statute's singling out of a specific county. (*Ibid*.) The Legislature's finding of such a rational relationship "is entitled to great weight and will not be reversed unless the determination is arbitrary and without any conceivable factual or legal basis." (*Ibid*.)

"If any state of facts can reasonably be conceived which would sustain a statutory classification, there is a presumption that this state of facts exists and the burden of demonstrating arbitrariness rests upon the party who assails the classification." (*Board of Education v. Watson* (1966) 63 Cal.2d 829, 833.) The Association fails to meet that burden.

In 2017, the Legislature enacted Senate Bill No. 703 to exempt Alameda County, along with another county and city, from the statewide cap on local sales taxes (Rev. & Tax. Code, § 7251.1) if certain requirements are met. In doing so, the Legislature determined a special statute was necessary to address the "unique fiscal pressures" preventing Alameda County

21

from funding "essential programs," such as childcare. (Stats. 2017, ch. 651, §§ 3, 5, eff. January 1, 2018.)

In 2019, the Legislature enacted Assembly Bill No. 723 to provide that neither the one-half percent exemption for Alameda County previously enacted by Senate Bill No. 703, nor a sales tax imposed by the Bay Area Rapid Transit District, would be counted in considering compliance with the statewide sales tax cap. Again, the Legislature identified "unique fiscal pressures" placed on Alameda County by transportation infrastructure. (Stats. 2019, ch. 747, § 4 and accompanying Legislative Counsel's Digest.)

In both instances, the Legislature identified reasonable bases for legislation targeting Alameda County. The Association wholly fails to meet its burden to demonstrate why the Legislature's rationale is arbitrary or unreasonable. (*Board of Education v. Watson, supra*, 63 Cal.2d at p. 833.)

## G.

Finally, the Association raises two challenges to Measure C's ballot materials. It contends that the county failed to comply with the Elections Code in setting (and providing notice of) a "reasonable date" for submission of arguments against the measure. The Association also maintains that the ballot materials were misleading because, while the text of the proposed ordinance provides that (absent extension) the tax will automatically terminate at the end of the 2040-2041 fiscal year, the ballot materials state that Measure C is a "20-year" tax. Neither challenge can be raised *after* the election.

### 1.

During a 10-day examination period, the public may examine ballot materials before they are printed (§ 9190, subd. (a)) and "seek a writ of mandate or an injunction requiring any or all of the materials to be amended or deleted." (§ 9190, subd.

22

(b)(1); accord, § 9106 ["[a]ny elector of the county may seek a writ of mandate requiring the ballot title or summary prepared by the county counsel to be amended"].)  Section 13314 similarly permits a voter to seek a preelection writ of mandate "alleging that an error or omission has occurred, or is about to occur . . . in the printing of, a ballot [or] county voter information guide, . . . or that any neglect of duty has occurred."  (§ 13314, subd. (a)(1).)

Given the existence of such remedies, the general rule is that an attack on the sufficiency or impartiality of ballot materials can only be brought *before* an election.  (See e.g., *Sierra Madre, supra,* 25 Cal.4th at pp. 192-194; *Denny v. Arntz* (2020) 55 Cal.App.5th 914, 920-922.)  Section 16100 enumerates a narrow (and exclusive) list of circumstances under which we have postelection authority to invalidate the results of an election.  (*Sierra Madre, supra,* at pp. 192-193.)  The rationale is both important and fundamental:  " 'Voters, not judges, mainly run our democracy.  It would threaten that core tenet if one person who did not like the election result could hire lawyers and with ease could invalidate an expression of popular will.' "  (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 124.)

There is also a constitutional exception to the preelection-challenge rule: "the California appellate courts have recognized the 'possibility' that an impartial analysis of a county measure or other ballot materials can be so misleading and inaccurate 'that constitutional due process requires invalidation of the election.' " (*Owens v. County of Los Angeles, supra*, 220 Cal.App.4th at p. 123.)  However, the bar is "very high" for such a postelection due process challenge.  (*Ibid.*)  "[W]here the complained-of irregularities consist of omissions, inaccuracies or misleading statements in the ballot materials" the challenger must demonstrate that the ballot materials "were so inaccurate or misleading as to prevent the voters from making informed

23

choices." (*Horwath v. City of East Palo Alto* (1989) 212 Cal.App.3d 766, 777.)

**2.**

As we noted previously, no argument against Measure C appeared in the voter information guide. The Association suggests that it would have submitted an argument against Measure C but could not do so because the registrar set December 11, 2019 as the deadline for submission of arguments—the very same day that notice of the deadline was published in a general circulation newspaper.[8] The Association maintains that it is therefore entitled to declaratory and injunctive relief—including an injunction prohibiting the county from enforcing Measure C—because the registrar violated Elections Code section 9163 and related provisions of the Government Code.

Elections Code section 9162 provides that any individual voter or association of citizens may file a written argument "for or against any county measure" and the "county elections official shall cause [any such] argument . . . to be printed, and shall enclose a copy of both arguments preceded by the [impartial analysis] with each county voter information guide." "Based on the time reasonably necessary to prepare and print the arguments, analysis, and county voter information guides and to permit the 10-calendar-day public examination . . . for the particular election, the county elections official *shall fix and determine a reasonable date* before the election after which no arguments for or against any county measure may be submitted." (Elec. Code, § 9163, italics added.) Notice of the fixed deadline "shall be published [once] in a newspaper of general circulation." (Gov. Code, §§ 6060, 6061; Elec. Code, § 9163.)

---

[8] The registrar did post notice of the argument submission deadline on the county's official election website weeks earlier.

24

The county does not argue that, by publishing notice of the deadline on the day opposition arguments were themselves due, the registrar set a reasonable deadline or provided constructive notice in compliance with section 9163. Nonetheless, we agree with the county that, having failed to invoke its preelection remedy to challenge the deadline and omission of opposition argument, the Association cannot obtain relief now. (See §§ 9190, subd. (b)(1), 13314; *McKinney v. Superior Court* (2004) 124 Cal.App.4th 951, 957 ["one cannot pass up a preelection remedy in favor of a postelection challenge"].)

The Association does not maintain that section 16100 allows it to bring its claim as a postelection challenge. Moreover, the Association, in its reply brief, disavows any reliance on the constitutional due process exception. Instead, the Association seeks to fashion a new exception to the preelection challenge rule. It asserts that we should order the trial court to grant equitable relief—including an injunction prohibiting the county from enforcing the Measure C ordinance—because the problem it complains of is likely to be repeated and will not otherwise be subject to review.

The Association is wrong. Should anything similar occur, any aggrieved party may file a preelection petition for writ of mandate or seek an injunction. (See §§ 9190, subd. (b)(1), 13314.) The Association seems to recognize as much because the only authority it cites involved a preelection challenge. (See *Sonoma County Nuclear Free Zone '86 v. Superior Court* (1987) 189 Cal.App.3d 167, 170, 176.)

### 3.

The Association also contends that the ballot materials were misleading because, although the measure would impose an increased sales tax for purportedly "more than twenty years," the ballot materials described Measure C as a "20-year half-percent sales tax."

The ballot materials were not misleading.  The tax imposed by Measure C became operative on July 1, 2020 and it expires 20 years, 11 months, and 29 days later—on June 30, 2041.  (See Gov. Code, § 13290.)  Measure C will expire after 20 full years, just before its 21st birthday.  It is perfectly reasonable to describe it as a 20-year tax.

In any event, the Association could have raised any purported inaccuracy in the ballot materials by filing a preelection petition for writ of mandate or by seeking a preelection injunction.  (See §§ 9190, subd. (b)(1), 13314, subd. (a)(1).)  The Association's allegations of unfairness do not come anywhere close to meeting the constitutional standard.  (See *Horwath v. City of East Palo Alto, supra*, 212 Cal.App.3d at pp. 776–778.)

### DISPOSITION

The judgments are affirmed.  The county is entitled to its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

BURNS, J.

WE CONCUR:


JACKSON, P.J.
CHOU, J.


*County of Alameda v. Alameda County Taxpayers' Association, Inc. et al.* (A166401)
*Alameda County Taxpayers' Association, Inc. et al. v. County of Alameda et al.* (A166404)

Alameda County Superior Court, Nos. RG20070099 and RG20070495, Hon. Jeffrey S. Brand.

Colantuono, Highsmith & Whatley, PC, Michael G. Colantuono, John A. Abaci, and Conor W. Harkins, for Plaintiff and Respondent in A166401 and Defendants and Respondents in A166404.

Law Offices of Jason A. Bezis, Jason A. Bezis, for Defendants and Appellants in A166401 and Plaintiffs and Appellants in A166404.

Howard Jarvis Taxpayers Foundation, Jonathan M. Coupal, Timothy A. Bittle, and Laura E. Dougherty for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Defendants and Appellants in A166401 and Plaintiffs and Appellants in A166404.