Filed 2/28/25  Drost v. Sheridan CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ISA DROST et al., | D084816 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. RIC2001107) |
| SHAMUS SHERIDAN et al., | |
| Defendants and Respondents. | |

APPEALS from a judgment and postjudgment order of the Superior Court of Riverside County, Irma Poole Asberry, Judge.  Affirmed.

Law Offices of Steven B. Stevens and Steven B. Stevens for Plaintiffs and Appellants; Jeffrey S. Raynes for Plaintiff and Appellant Isa Drost; Law Offices of Patricia A. Law and Patricia Anne Law for Plaintiff and Appellant Jeffrey Drost.

Horvitz & Levy, H. Thomas Watson and Eric S. Boorstein; La Follette Johnson Dehaas Fesler and Ames, Barry A. Vogel and Kristine A. Balogh for Defendants and Respondents.

In 2018, then 14-year-old Jake Drost—who had a pre-existing heart condition—died from cardiac arrest after participating in a 100-yard dash for

his school's Junior Reserve Officers' Training Corps program (at times, JROTC or the program). Before Jake began participating, defendant and respondent Shamus Sheridan, a licensed chiropractor, screened and cleared him for the program and its strenuous physical activities. Plaintiffs Isa Drost and Jeffrey Drost, Jake's parents,[1] sued Sheridan and his medical corporation, Sheridan Chiropractic, Inc., for negligence and obtained a jury verdict awarding plaintiffs $7 million in past noneconomic damages and $22.5 million in future noneconomic damages. On defendants' post-verdict request, the trial court reduced the noneconomic damages award to the then statutory $250,000 cap under Civil Code section 3333.2,[2] the Medical Injury Compensation Reform Act (MICRA), finding Sheridan's negligent physical examination of Jake "within the scope of his chiropractic license." It later taxed plaintiffs' expert fees and accrued prejudgment interest sought under Code of Civil Procedure section 998 and Civil Code section 3291, reasoning that with the reduced verdict, plaintiffs did not show they obtained a more favorable result than their $249,999 settlement offers.

Plaintiffs appeal from the trial court's judgment, contending that as a matter of statutory interpretation MICRA does not apply because Sheridan failed to establish he acted within the scope of his chiropractic license when he evaluated Jake and recommended him for strenuous physical activity. They ask that if we reverse the judgment, we also reverse the court's postjudgment order taxing costs. We affirm the judgment and postjudgment order.

---

[1] Plaintiffs had divorced and Jeffrey Drost had remarried years before Jake's death.

[2] Undesignated statutory references are to the Civil Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

*Jake's Death and Medical History*

In October 2018, Jake suffered cardiac arrest and died after participating in a 100-yard dash for his high school JROTC. He was 14 years old. Jake was born with a defective right ventricle in his heart, and had undergone two prior open heart surgeries: one to replace the defective valve during the first few months of his life, and another when he was 10 years old to replace the valve and place a defibrillator to prevent abnormal heart rhythms. In early 2018, the defibrillator had become detached and stopped working.

Jake had long been under regular care with a cardiologist but was otherwise able to engage in normal play and physical activities with the exception of sports such as football or hockey that might result in a direct hit to his chest. Jake also took metoprolol, a medication to prevent heart arrythmia or heart failure.

*Jake's Physical Exam with Sheridan for JROTC*

Months earlier in August 2018, Sheridan saw Jake for a screening and physical examination as part of the process to join the program. Sheridan conducted Jake's screening without the presence of Jake's father, who had brought him to Sheridan's office.[3] Jake had with him a questionnaire about medical conditions that he had filled out, which both he and his father had signed. Thus, when Sheridan conducted his exam, he knew he was screening Jake for JROTC, that the program involved strenuous activity, that Jake had some form of congenital heart defect with multiple heart surgeries, that Jake was taking metoprolol for high blood pressure, that Jake was treating with a

---

[3] Sheridan admitted that his examination of Jake without his parent was in and of itself below the standard of care for a chiropractor.

3

doctor for his right ventricle, that Jake had an internal defibrillator, and that the defibrillator was detached.[4]

Though Sheridan had no training in the heart, after learning these circumstances, he still believed he had the training to evaluate Jake. Sheridan listened to Jake's heart with a stethoscope and checked boxes on the screening form, but did not make notes about Jake's condition. Following the screening, Sheridan was comfortable clearing Jake, approving him as capable of strenuous activity for participation in JROTC.

*Plaintiffs' Lawsuit and Jury's Special Verdict*

Plaintiffs sued Sheridan, Sheridan Chiropractic, Inc. and others for wrongful death, alleging Sheridan negligently cleared Jake for participation in the program, causing Jake's death from fatal cardiac arrythmia. Defendants answered the complaint, in part alleging as an affirmative defense that if found negligent, the damages for noneconomic losses should not exceed the amount specified in MICRA.

In May 2021, plaintiffs separately served Sheridan with Code of Civil Procedure section 998 offers to compromise for $249,999.

The matter proceeded to a jury trial, during which the parties presented expert chiropractors who testified about the scope of chiropractic care and a chiropractor's standard of care. All of the experts agreed that the scope of practice permitted chiropractors to screen children to determine whether they could participate in athletics, but that in a case of a child with underlying cardiac conditions like Jake, the standard of care would not permit the chiropractor from continuing the evaluation or clearing that child

---

[4]    At trial, Sheridan testified he did not recall seeing Jake but had reviewed Jake's screening form, which was the only medical information he had about Jake at the time of his evaluation.

4

for strenuous activity. Plaintiffs' experts testified that in evaluating Jake to determine whether he could participate in JROTC, Sheridan made a medical decision or was practicing outside the scope of chiropractic that was also below the standard of care. In cross-examination, however, one of plaintiffs' experts agreed that Sheridan did not either treat or diagnose Jake's cardiac condition.

Sheridan's expert testified that Sheridan examined Jake for a musculoskeletal assessment as to whether he could be cleared to do sports. He agreed that chiropractors were limited by regulation to treatment and evaluation of patients within the musculoskeletal system, and were not authorized to treat or evaluate heart pathology or disease. He agreed that if a chiropractor found a heart abnormality during a child's sports physical, "the further care, treatment or plan on the basis of the heart would have to be referred out to someone, a medical doctor, such as a cardiologist or even a family doctor," but testified that Sheridan, who understood Jake was already under cardiology care, found no abnormality warranting referral to a cardiologist. Though Sheridan's expert agreed a chiropractor was not trained to assess the effect on the heart of strenuous activity of a minor in Jake's circumstances and that to do so would be the practice of medicine, the expert nevertheless testified that Sheridan was within the chiropractic standard of care in approving Jake and was not practicing medicine that day.

The jury found by special verdict that Sheridan was negligent in his evaluation and clearance of Jake for strenuous physical activity, and that the negligence caused plaintiffs $7 million in past noneconomic damages and $22.5 million in future noneconomic damages.

*Post-trial Briefing*

After trial, Sheridan filed a brief asking the court to apply MICRA's cap on noneconomic damages. In part, he asserted that California's Board of Chiropractic Examiners and all of the witnesses in the matter had agreed that licensed chiropractors are permitted to conduct preparticipation physical examinations to clear student-athletes for strenuous activities. He argued that because plaintiffs' action was based on his athletic clearance decision, MICRA applied even if his decision was wrong or violated professional standards; that the "action arose out of the 'general range of activities' encompassed by his license" under *Lopez v. Ledesma* (2022) 12 Cal.5th 848, 857 (*Lopez*). Sheridan asked the court to take judicial notice of federal Department of Transportation forms—a medical examination form and a medical examiner's certificate for commercial driver medical certifications— as well as a November 2014 letter from the Board of Chiropractic Examiners and an accompanying preparticipation physical evaluation form.[5]

Plaintiffs separately opposed the request. Isa Drost argued Sheridan's act of evaluating and recommending Jake for strenuous JROTC—knowing Jake's cardiac history—constituted the illegal practice of medicine, specifically pediatric cardiology. She maintained the expert testimony uniformly established that Sheridan made a medical decision beyond the scope of his chiropractic license when he evaluated Jake based on the information about his cardiac condition provided in the screening questionnaire. Jeffrey Drost argued Sheridan Chiropractic, Inc. had not met its burden of proving MICRA applied because it had admitted in discovery that it was not licensed. He also argued the trial evidence showed Sheridan's

---

[5]  In its ruling, the trial court did not reference defendants' request for judicial notice. Defendants renew the request in this court, which we address below.

6

negligent actions were outside the scope of Sheridan's license: "Diagnosing a heart condition and opining on whether that heart condition makes it unreasonably risky for a person to participate in strenuous activities is far outside the scope of a chiropractor's license." Jeffrey Drost characterized Sheridan's action as "accepting the assignment to evaluate a heart patient and providing a *medical diagnosis* that Jake's heart condition and high blood pressure did not preclude participation in the strenuous activities of the [JROTC] program." Jeffrey Drost distinguished *Lopez*, *supra*, 12 Cal.5th 848 but argued it supported plaintiffs' position, as Sheridan's license precluded him from practicing medicine.

Observing MICRA applied to chiropractors and also to any employing entity held vicariously liable for the professional negligence of its agents, the trial court granted the motion. It ruled Sheridan's "performance of the preparticipation physical exam on Jake Drost was within the scope of his chiropractic license." Citing *Lopez*'s statement that the " 'scope of services for which the provider is licensed' " is "naturally understood as the general range of activities encompassed by the provider's license" (*Lopez*, *supra*, 12 Cal.5th at p. 857), the court found Sheridan performed a physical but did not provide Jake with any treatment, perform surgery, administer medications, or prescribe any treatment of any ailment or condition. It stated: "Every expert witness at trial agreed that chiropractors can conduct preparticipation physical examinations to clear or reject student athletes for strenuous physical activity. . . . There is no dispute this is the kind of exam Dr. Sheridan conducted with Jake. [¶] Plaintiffs argue, though, that Dr. Sheridan exceeded the scope of his license as a chiropractor when he cleared Jake to participate in [JROTC]. [One of plaintiffs' experts] testified that Dr. Sheridan had 'two options.' The first was to 'fail' Jake and the second was to

7

refer Jake because Sheridan could not clear Jake given his heart issue. . . .

However, there was a third option and this is the option Dr. Sheridan took,

he cleared Jake to participate in [JROTC]. Dr. Sheridan committed

professional negligence in clearing Jake. Chiropractors are permitted by

their license to perform physical exams. Dr. Sheridan's negligence occurred

within the scope of his chiropractic license, thus MICRA applies."

Plaintiffs filed a joint notice of appeal from the judgment. Thereafter,

on Sheridan's motion, the court taxed certain of plaintiffs' costs ($18,695.45

in deposition costs, $45,877.94 in witness fees, and $4,378 in court reporter

fees) as well as $46,984.14 in prejudgment interest, on the grounds plaintiffs

had not shown they obtained a more favorable judgment than their Code of

Civil Procedure section 998 offers. Plaintiffs separately appealed from that

postjudgment order.

## DISCUSSION

### I. *Application of MICRA*

A. *The MICRA Law*

"The Legislature enacted MICRA in 1975 . . . to address a statewide

'crisis regarding the availability of medical malpractice insurance.' " (*Lopez*,

*supra*, 12 Cal.5th at p. 855; see also *id*. at p. 859.) The statute " 'includes a

variety of provisions all of which are calculated to reduce the cost of insurance

by limiting the amount and timing of recovery in cases of professional

negligence.' " (*Id*. at p. 856, quoting *Western Steamship Lines, Inc. v. San*

*Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 111.) "MICRA provisions

should be construed liberally in order to promote the legislative interest . . .

to reduce [malpractice insurance] premiums.' " (*Lopez*, at p. 859.)

The MICRA provision relevant at the time of the court's order imposed

a $250,000 cap on noneconomic damages "[i]n any action for injury against a

health care provider based on professional negligence[.]" (Former § 3333.2, subds. (a), (b).)[6] This " 'key component' " (*Lopez*, *supra*, 12 Cal.5th at p. 859) of MICRA "was designed 'to control and reduce medical malpractice insurance costs by placing a predictable, uniform limit on the defendant's liability for noneconomic damages.' " (*Ibid*.)

MICRA defines professional negligence as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, *provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital*." (Former § 3333.2, subd. (c)(2), italics added; see *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 320.) In *Lopez*, the court explained that "[t]he language 'scope of services for which the provider is licensed' " within the meaning of section 3333.2, subdivision (c)(2) "is naturally understood as the general range of activities encompassed by the provider's license. A psychiatrist, for instance, is licensed to provide psychiatric treatment. Thus, a psychiatrist's conduct arising out of the course of psychiatric treatment falls within the scope of services for which the psychiatrist is licensed. [Citation.] By contrast, a 'psychologist perform[ing] heart surgery' does not provide services within the scope of his or her

---

6    The Legislature effective January 1, 2023, amended the provision by Assembly Bill No. 35 (2021-2022 Reg. Sess.). Section 3333.2 presently states that civil liability for noneconomic damages against health care providers in professional negligence actions filed on or after January 1, 2023, and not involving wrongful death, shall not exceed $350,000. (§ 3333.2, subd. (b).) In actions involving wrongful death, noneconomic damages shall not exceed $500,000. (§ 3333.2, subd. (c).) In addition, the respective dollar amounts are to increase by set amounts through January 1, 2033, and thereafter shall be adjusted for inflation each year, by 2 percent. (§ 3333.2, subds. (g) & (h).)

license." (*Lopez*, *supra*, 12 Cal.5th at pp. 857-858, citing *Waters v. Bourhis* (1985) 40 Cal.3d 424, 436.)

*Lopez* involved physician assistants, whose governing statute, the Physician Assistant Practice Act, "only authorized [them] to perform services 'when the services are rendered under the supervision of a licensed physician and surgeon . . . .'" (*Lopez*, *supra*, 12 Cal.5th at p. 858.) The question before the California Supreme Court was whether section 3333.2's cap applied to actions against physician assistants where a licensed physician has legal responsibility for supervising them but provides minimal or no actual supervision. (*Lopez*, at p. 857.) The physician assistants there had misdiagnosed a lesion without the supervision of the doctor who owned the dermatology clinic. (*Id.* at pp. 854-855.) As a matter of statutory interpretation of both MICRA and the Physician Assistant Practice Act as well as regulations promulgated by the Physician Assistant Board (*id.* at pp. 857-858), the court held "a physician assistant practices within the scope of his or her license for purposes of MICRA's cap on noneconomic damages when the physician assistant acts as the agent of a licensed physician, performs the type of services authorized by that agency relationship, and does not engage in an area of practice prohibited by the [Physician Assistant Practice Act]." (*Id.* at pp. 861-862.)[7] The court rejected the plaintiff's arguments that the

---

[7] The governing statute in *Lopez* authorized a physician assistant "to perform services 'when the services are rendered under the supervision of a licensed physician and surgeon,'" and thus the question boiled down to "what it means for a physician assistant to be 'under the supervision' of a licensed physician." (*Lopez*, *supra*, 12 Cal.5th at p. 858.) The governing statute also specified particular areas of practice, such as dentistry, that physician assistants were not permitted to perform even under supervision. (*Ibid.*) But the facts in *Lopez* did not raise questions about such prohibited areas of practice, as they do here with respect to the practice of medicine.

physician's supervision had to be adequate, and absent that, the physician assistants acted outside the scope of their license. (*Id*. at pp. 858-860.)

The *Lopez* court also turned to the question of whether the circumstances fell within an exemption for services "within any restriction imposed by the licensing agency or licensed hospital." (*Lopez, supra*, 12 Cal.5th at p. 862.) In doing so, the court emphasized it had previously held that proviso was not intended to exclude an action from MICRA because a health care provider acted contrary to professional standards or engaged in unprofessional conduct; " '[i]nstead, it was simply intended to render MICRA inapplicable when a provider operates in a capacity for which he is not licensed—for example, when a psychologist performs heart surgery.' " (*Ibid*., quoting *Waters v. Bourhis, supra*, 40 Cal.3d at p. 436.) According to *Lopez*, " 'the "restriction" mentioned in this clause must be a limitation on the scope of a provider's practice beyond simply the obligation to adhere to standards of professional conduct.' " (*Id*. at p. 863.) Thus, a physician assistant would not render services " 'within [a] restriction imposed by the licensing agency' " under section 3333.2, subdivision (c)(2) by failing to comply with supervisory regulations such as requiring a physician to be available in person or by electronic communication at all times when the physician assistant is caring for patients. (*Id*. at pp. 862-863, citing Cal. Code Regs., tit. 16, § 1399.545, subd. (a).) Those kinds of supervisory regulations "are not restrictions imposed by a physician assistant's licensing agency." (*Id*. at p. 863.)

Under *Lopez*, whether MICRA's cap on noneconomic damages applies to an action raising questions about the "scope of services for which the provider is licensed" or within a licensing agency restriction (§ 3333.2, subd. (c)(2)) is a matter of statutory interpretation we assess de novo. (*Lopez, supra*, 12 Cal.5th at p. 857.) "[O]ur role is confined to interpreting the

11

[governing] statute[s] in the manner that comports most closely with the Legislature's purpose in enacting MICRA" (*id.* at p. 861) which is in part to " 'ensure[ ] predictability in damage awards.' " (*Ibid.*)

B. *Scope of Chiropractic Licenses and the Practice of Medicine*

Based on the above summarized principles, our inquiry for purposes of applying MICRA is whether plaintiffs' action was based on Sheridan's "professional negligence," that is, whether Sheridan acted "within the scope of services for which [he] is licensed and . . . not within any restriction imposed by the licensing agency . . . ." (§ 3333.2, subd. (c)(2); *Lopez, supra,* 12 Cal.5th at p. 856.) To decide this question of law (*id.* at p. 857), we examine the statutes and regulations governing the question, including the Chiropractic Initiative Act of 1922 (the Chiropractic Act or the Act), published for reference at sections 1000-1 to 1000-20 of the Business and Professions Code.

1. *Chiropractic Act and Regulations*

Section 7 of the Chiropractic Act (Bus. & Prof. Code, § 1000-7) is the only provision that defines chiropractic or declares what is authorized by a license issued under the Act. (*Tain v. State Bd. of Chiropractic Examiners* (2005) 130 Cal.App.4th 609, 618, 624 (*Tain*); *Ammon v. Superior Court* (1988) 205 Cal.App.3d 783, 792-793; *Crees v. California State Bd. of Medical Examiners* (1963) 213 Cal.App.2d 195, 204 (*Crees*); *People v. Fowler* (1938) 32 Cal.App.2d Supp. 737, 745 (*Fowler*); 59 Ops.Cal.Atty.Gen. 420, 423 (1976) [section 7 is the "only section of the [Chiropractic Act] which defines the practice of chiropractic"].) "Section 7 [of the Chiropractic Act] provides that a chiropractic license 'shall authorize the holder thereof to practice chiropractic in the State of California as taught in chiropractic schools or colleges; and, also, to use all necessary mechanical, and hygienic and sanitary measures

12

incident to the care of the body, but shall not authorize the practice of medicine, surgery, osteopathy, dentistry or optometry, nor the use of any drug or medicine now or hereafter included in materia medica.' " (*Tain*, at p. 618.)  The authorization to practice chiropractic "as taught in chiropractic schools or colleges," however, "cannot be enlarged by any changes of the curricula of those schools.  Consequently, chiropractors are confined to the established measures of adjusting the joints by hand, and to incidental mechanical and hygienic measures that do not invade the field of medicine and surgery." (*Id*. at pp. 624-625; see *Crees*, *supra*, 213 Cal.App.2d at p. 204 [" '[t]he effect of the words "as taught in chiropractic schools or colleges" is not to set at large the signification of "chiropractic," leaving the schools and colleges to fix upon it any meaning they choose' "], quoting *Fowler* at p. 745; see also *People v. Mangiagli* (1950) 97 Cal.App.2d Supp. 935, 939 (*Mangiagli*); *In re Hartman* (1935) 10 Cal.App.2d 213, 217.)

The Board of Chiropractic Examiners (the Board), created by the Act, is authorized to adopt implementing regulations.  (*Tain*, *supra*, 130 Cal.App.4th at p. 618; *Oranen v. State Bd. of Chiropractic Examiners* (1999) 77 Cal.App.4th 258, 371; *People v. Schuster* (1932) 122 Cal.App.Supp. 790, 792.) In 1954, it promulgated title 16, section 302 of the California Code of Regulations (at times, regulation 302).  (*Crees*, *supra*, 213 Cal.App.2d at p. 209.)  Regulation 302 "allows 'duly licensed chiropractor[s]' to 'manipulate and adjust the spinal column and other joints of the human body and in the process thereof . . . may manipulate the muscle and connective tissue related thereto.' " (*Tain*, *supra*, 130 Cal.App.4th at p. 618, quoting Cal. Code Regs., tit. 16, § 302, subd. (a)(1).)  The regulation further provides that "a duly licensed chiropractor may treat any condition, disease, or injury in any patient . . . and may diagnose, so long as such treatment or diagnosis is done

13

in a manner consistent with chiropractic methods and techniques *and so long as such methods and treatment do not constitute the practice of medicine* by exceeding the legal scope of chiropractic practice as set forth in this section." (Cal. Code Regs., tit. 16, § 302, subd. (a)(3), italics added.)[8]

Regulations additionally list a range of unprofessional conduct for licensed chiropractors. (Cal. Code Regs., tit. 16, § 317.) Relevant here, unless a patient states he or she is already under the care of an appropriate physician, a licensed chiropractor engages in unprofessional conduct by failing to refer a patient to such a physician when the licensed chiropractor "detects an abnormality that indicates that the patient has a physical . . . condition [or] disease . . . that is not subject to appropriate management by

---

[8] Regulation 302 was most recently upheld in *Tain, supra,* 130 Cal.App.4th 609 against a challenge that it impermissibly narrowed the Chiropractic Act. (*Id.* at p. 614.) In resolving the question, the Court of Appeal undertook to consider the Chiropractic Act and its scope, finding the permissible limits of chiropractic practice were described in *Fowler, supra,* 32 Cal.App.2d Supp. 737 and *Crees, supra,* 213 Cal.App.2d 195. (*Tain,* at pp. 619-620.) "The holding of both [*Fowler* and *Crees*] is that section 7 of the Chiropractic Act limited authorized chiropractic healing practices to those taught in chiropractic schools at the time of the enactment of the initiative measure (1922), and that authorization cannot be enlarged by any changes of the curricula of those schools. Consequently chiropractors are confined to the established measures of adjusting the joints by hand, and to the incidental mechanical and hygienic measures that do not invade the field of medicine and surgery." (*Tain,* at pp. 624-625.) The appellate court found nothing in the record indicating the scope of regulation 302 did not reflect the mandate of section 7 of the Chiropractic Act. (*Id.* at p. 625.) *Tain* further rejected an argument that 1978 amendments to the Chiropractic Act mandating elective courses expanded the scope of practice, explaining that those amendments pertained to a different section and did not change the wording of section 7, the sole provision in the Act dealing with the scope of practice. (*Id.* at pp. 627-628.)

14

chiropractic methods and techniques."  (Cal. Code Regs., tit. 16, § 317, subd. (w).)

These regulations may not alter or enlarge the terms of the enabling statute.  (See *In re Gadlin* (2020) 10 Cal.5th 915, 926 [" ' "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations" ' "]; *Tain, supra,* 130 Cal.App.4th at p. 618 ["To be valid, an administrative regulation must be consistent with the legislation it is designed to implement"]; *Crees, supra,* 213 Cal.App.2d at p. 210; *Mangiagli, supra,* 97 Cal.App.2d Supp. at p. 943.)  Given this principle, " 'questions of the extent and scope of chiropractic' " need not be referred to the Board of Chiropractic Examiners before a court decides such a question.  (*Crees*, at p. 210 [rejecting amicus curie argument that such questions about the scope of chiropractic practice "should have been referred to the Chiropractic Board for its consideration and recommendation to the court before it took final action"].)

While a chiropractic license does not authorize the practice of medicine or the use of any drug or medicine, "the practice of chiropractic includes diagnosis . . . if for no other reason but that in many instances it is necessary for a chiropractor to determine that a patient's . . . ailment is outside the permissible scope of his own practice."  (59 Ops.Cal.Atty.Gen. at p. 423, *supra*; see Cal. Code Regs., tit. 16, § 302, subd. (a)(3); *Ammon v. Superior Court, supra,* 205 Cal.App.3d at pp. 792-793.)  This conclusion arises from a 1976 opinion of the Attorney General as to what "arts" a chiropractor may practice under his or her license.  (59 Ops.Cal.Atty.Gen. at p. 420, *supra*.)  The Attorney General stated that with regard to the "specialized fields" of "diagnosis" and other areas such as anatomy, physiology and chemistry, a

15

chiropractor may use "*concepts* contained in these 'arts' . . . in a limited and circumscribed manner *so long as* said use does not exceed the limits of the practice of chiropractic." (*Id*. at p. 423.) The Attorney General found it "clear," however, that "the 'art' and practice necessarily involved" in some "specialized medical fields" including "cardiology [and] pediatrics . . . are outside the scope of the practice of chiropractic, and may not be practiced." . . . [T]hese terms are so identified with medical specialties of physicians and surgeons, that a court would take judicial notice of such a fact . . . [as] . . . 'not reasonably subject to dispute and . . . capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy.' " (*Id*. at p. 422.) Attorney General opinions are entitled to " 'considerable weight.' " (*Ruelas v. County of Alameda* (2024) 15 Cal.5th 968, 974; *People ex rel. Allstate Ins. Co. v. Discovery Radiology Physicians, P.C.* (2023) 94 Cal.App.5th 521, 538, fn. 7.)

     2. *The Practice of Medicine and Relation to the Chiropractic Act*

"The Medical Practice Act . . . and related provisions regulate the practice of medicine in California. Among other things, the Medical Practice Act prohibits unlicensed persons from practicing, advertising, or holding themselves out as practicing 'any system or mode of treating the sick or afflicted' or 'diagnos[ing], treat[ing], operat[ing] for, or prescrib[ing] for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person.' " (*People ex rel. Allstate Ins. Co. v. Discovery Radiology Physicians, P.C.*, *supra*, 94 Cal.App.5th at p. 533, quoting Bus. & Prof. Code, § 2052, subd. (a).)[9]

---

[9] Business and Professions Code section 2141 makes it a misdemeanor for an unlicensed person to engage in such practices. (See *People v. Augusto* (1961) 193 Cal.App.2d 253, 256; *People v. Machado* (1929) 99 Cal.App. 702, 706.)

16

The Medical Practice Act specifically defines what it means to diagnose: "Whenever the words 'diagnose' or 'diagnosis' are used in this chapter, they include any undertaking by any method, device, or procedure whatsoever, and whether gratuitous or not, *to ascertain or establish whether a person is suffering from any physical or mental disorder*." (Bus. & Prof. Code § 2038, italics added.) "When a statute provides a specific definition of a term, the term 'must be understood as it is defined, not in its colloquial sense.' " (*Little v. Commission on Teacher Credentialing* (2022) 84 Cal.App.5th 322, 336, quoting *People v. Gonzales* (2017) 2 Cal.5th 858, 871, fn. 12 [explaining that such definitions create " 'terms of art' " or " 'words having specific, precise meaning in a given specialty' "].)

"[T]he passage of the Chiropractic Act did not effect a repeal or amendment of any portion of the 1913 Medical Practices Act" but "provided a complete defense to an action brought for violating [that act], to the extent one was practicing chiropractic as authorized by the Chiropractic Act." (*Tain*, *supra*, 130 Cal.App.4th at p. 617.) The "only effect of the enactment of the Chiropractic Act on the Medical Practice Act was to create a limited exception to the prohibition against practicing a healing art without a license from the Board of Medical Examiners; that a holder of a license to practice chiropractic may practice chiropractic (not medicine or surgery); and that is the limit of the exception." (*Crees*, *supra*, 213 Cal.App.2d at p. 209.)

C. *Contentions*

Asserting that the application of MICRA is an affirmative defense that was Sheridan's burden to prove, plaintiffs contend Sheridan did not meet that burden. Importantly, they do not dispute that a chiropractor's license authorizes preparticipation physical examinations or screenings for school sports or federally regulated activities. Rather, plaintiffs maintain Sheridan

17

practiced medicine—specifically pediatric cardiology—when, at the moment he learned of Jake's multiple cardiac problems, he continued his evaluation then cleared and recommended Jake for strenuous JROTC.[10] According to plaintiffs, Sheridan "made a medical evaluation and medical recommendation about Jake's cardiac condition" when he "determined that Jake's heart was fit for strenuous activities—despite being unprotected by a defibrillator." They maintain this "was not the practice of chiropractic; that was the practice of cardiology."

In making these arguments, plaintiffs point in part to the experts' trial testimony, as well as that of Sheridan's brother/business partner, about the practice of medicine, saying it contradicted any claim Sheridan acted within the scope of his license. Plaintiffs discuss authorities involving chiropractors

_____

[10] In their reply brief, plaintiffs argue the jury's negligence finding constitutes a finding that Sheridan acted outside the scope of his license for purposes of applying MICRA. In response, defendants move to augment the record on appeal with the jury instructions and verdict form, which assertedly show the jury was not instructed on how to assess whether Sheridan acted outside the scope of his license. They argue plaintiffs forfeited this argument by raising it too late and not presenting an adequate record, but in the event we do not find a forfeiture, we should augment the record as requested. We agree plaintiffs forfeited the argument by failing to make it in their opening appellate brief. (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178 [reviewing courts "generally do not consider arguments raised for the first time in a reply brief"]; *Burton v. Campbell* (2024) 106 Cal.App.5th 953, 970.) Accordingly, we deny defendants' motion.

prosecuted under the Medical Practice Act (Bus. & Prof. Code, § 2141)[11]—as well as *Fowler*, *supra*, 32 Cal.App.2d Supp 737, *Crees*, *supra*, 213 Cal.App.2d 195 and *Tain*, *supra*, 130 Cal.App.4th 609, on the scope of chiropractic practice. Plaintiffs argue *Lopez*, *supra*, 12 Cal.5th 848, relied upon by the trial court, is factually inapposite. They also say *Lopez* actually undermines Sheridan's position that his examination was "within 'the range of activities encompassed by [Sheridan's] license.'" The latter argument to us appears circular: plaintiffs seem to take that position based on the fact *Lopez* "reinforced the plain language of [s]ection 3333.2(c)(2), which renders the limits on damages recovery (and the rest of MICRA) 'inapplicable when a provider operates in a capacity for which he is not licensed.'"

Characterizing MICRA as a "limitation of damages" rather than an affirmative defense, defendants respond that to decide whether MICRA applies to particular conduct, a court must "determine whether the alleged negligence arose out of the 'general range of activities' . . . or 'course of . . . treatment' . . . encompassed by the license, even if the law or professional standards prohibit the particular action that resulted in liability." According to them, MICRA applies to this action because Sheridan's decision to examine and clear Jake for strenuous physical activities—even if wrong—arose out of the "general range of activities" encompassed in preparticipation physical

---

11     These authorities involve chiropractors whose conduct invaded the field of medicine under more straightforward circumstances. (*People v. Machado, supra,* 99 Cal.App. at p. 704 [chiropractor diagnosed three-year-old child with pneumonia then prescribed medicines for the condition]; *In re Hartman, supra,* 10 Cal.App.2d at p. 215 [treating cancer by injecting an antitoxin], *People v. Fowler*, *supra*, 32 Cal.App.2d Supp. 737 [removing a fetus from a woman's womb, according to *Tain, supra,* 130 Cal.App.4th at p. 620, fn. 7]; *Mangiagli, supra*, 97 Cal.App.2d Supp. 935, 937 [administering blood plasma and hypodermic injection of liver extract to treat what the chiropractor concluded was shock due to uterine hemorrhage].)

19

examinations authorized by his license.  Defendants argue, citing *Ammon v. Superior Court*, *supra*, 205 Cal.App.3d 783 and pointing to courses taught in chiropractic schools, that while chiropractors are not licensed physicians, "there is a partial 'overlap between the practice authorized by a physician's and surgeon's certificate and by a license to practice chiropractic,' " which permits chiropractors to make general diagnostic decisions so as to refer patients for appropriate treatment.  According to defendants, given that asserted overlap, the statutes pertaining to the scope of medical practice do not determine whether MICRA applies since chiropractic regulations allow a chiropractor to diagnose in a manner consistent with chiropractic methods, which include relying on a patient's self-reported course of treatment with physicians when deciding whether to refer the patient to a medical doctor.

D.  *Analysis*

We emphasize what is not before us.  As indicated above, plaintiffs concede that preparticipation screening evaluations for student athletics are within the scope of chiropractic practice.  Thus, we have no occasion to decide that point.  (Accord, *In re Mohammad* (2022) 12 Cal.5th 518, 542 [conc. opn.

of Liu, J.].)[12] We assume without deciding that the examination itself was within the scope of services for which Sheridan was licensed. (§ 3333.2, subd. (c)(2).) Likewise, we need not decide the dispute over whether MICRA is an affirmative defense (see *Pressler v. Irvine Drugs, Inc.* (1985) 169 Cal.App.3d 1244, 1248 [referring to section 3333.2 as an affirmative defense without analysis]) or a damages limitation (*Taylor v. U.S.* (9th Cir. 1987) 821 F.2d 1428, 1433 [§ 3333.2 is a limitation of liability rather than an affirmative defense]), as Sheridan pleaded it as an affirmative defense.

The issue is more narrowly whether Sheridan's decision to clear Jake for JROTC after having learned of his abnormal cardiac condition and nonworking defibrillator fell "within any restriction imposed by the [Board of Chiropractic Examiners]" (*Lopez, supra,* 12 Cal.5th at p. 863) so as to exempt him from MICRA. Contrary to defendants' argument that the Medical

---

[12] The concession eliminates our need to consider defendants' arguments that preparticipation physical examinations are within the scope of the chiropractic license. As part of this argument, defendants renew their request that we take judicial notice of federal Department of Transportation forms that assertedly "illustrate the type of medical information chiropractors are legally authorized and expected to collect and evaluate" and "are relevant to this court's determination regarding the scope of a chiropractic license." Defendants argue the Chiropractic Board's letter and form "show the types of physical examinations and considerations that, in the Board's opinion, are within the scope of chiropractic practice." We question the relevance of a letter opinion of the Chiropractic Board on the scope of a chiropractor's license, particularly when the letter in part relies upon specific courses taught in chiropractic schools. (*Tain, supra*, 130 Cal.App.4th at pp. 624-625; *Crees, supra*, 213 Cal.App.2d at p. 210.) There is no need to decide the point, as we deny the request as unnecessary to resolve this appeal. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

Practice Act is not dispositive,[13] we conclude that under the law, regulations and authorities above, the answer in fact turns on whether that clearing decision constitutes the practice of medicine, which both section 7 of the Chiropractic Act and regulation 302, subdivision (a)(3), specifically restrict from the scope of chiropractic practice. If so, plaintiffs' action is not one for professional negligence to which MICRA applies.

We hold Sheridan's clearance decision was not the practice of medicine. Given the narrow set of undisputed facts as to how Sheridan conducted his evaluation, the legal question (*Lopez, supra*, 12 Cal.5th at p. 857) is straightforward. It is governed only by the statutes themselves and consistent regulations, as well as the Attorney General's interpretation, not by the trial expert testimony on the issue of chiropractic standard of care or the practice of medicine. We need not consider the trial court's reasoning on this question of law. (*Willis v. City of Carlsbad* (2020) 48 Cal.App.5th 1104, 1128.) In evaluating and clearing Jake, Sheridan did not "diagnose . . . any

---

[13] Defendants rely on *Ammon v. Superior Court, supra*, 205 Cal.App.2d 783. But in *Ammon*, the court was deciding not MICRA issues, but whether a provision of the Code of Civil Procedure requiring an attorney certificate of merit in a malpractice action must reflect that counsel had consulted with a professional licensed in the same discipline as the defendant. (*Id*. at pp. 786-787.) The Court of Appeal observed that chiropractors were authorized to use "the concepts of . . . diagnosis" and other fields in a "limited and circumscribed manner" and from that concluded there was a "limited overlap between the practice authorized by a physician's and surgeon's certificate and by a license to practice chiropractic." (*Id*. at p. 793.) Thus, the court concluded the "holder of a physician's and surgeon's certificate, if possessing the necessary expertise in the particular subject at issue, may be permitted to testify in a case—such as the present one—involving the professional conduct of a chiropractor." (*Ibid*.) *Ammon* is not controlling on the MICRA issue presented here or whether plaintiffs' action was based on Sheridan's practice of medicine outside the scope of his license.

. . . physical . . . condition," meaning he did not "ascertain or establish whether [Jake was] suffering from any physical . . . disorder." (Bus. & Prof. Code, §§ 2038, 2052.) Rather, having received Jake's screening questionnaire, Sheridan conducted his evaluation already knowing of Jake's abnormal cardiac history. He did not medically diagnose Jake's condition, which was already disclosed to him. Because Sheridan's clearance decision did not involve a diagnosis within the meaning of the Medical Practice Act, it was not conduct excepted from MICRA's definition of professional negligence as "within any restriction imposed by the licensing agency . . . ." (Former § 3333.2, subd. (c)(2).)

Plaintiffs' cited authorities do not persuade us to reach a different conclusion. They particularly rely on *Mangiagli*, in which the defendant, prosecuted for violating the Medical Practice Act, claimed he had acted upon an emergency, bringing him within an exception for "service in case of emergency." (*Mangiagli*, 97 Cal.App.2d at p. 941, citing Bus. & Prof. Code, § 2144.) In affirming the judgment as supported by substantial evidence, the court observed the jury had rejected that argument based on the fact the defendant had been called the day before he visited the patient, spent time packing gauze and waiting for blood plasma, and testified he did not call a medical doctor not because of an emergency or lack of time, but because he felt he was " 'capable enough to take care of her.' " (*Mangiagli*, 97 Cal.App.2d at p. 942.) Plaintiffs compare these circumstances to *Mangiagli*, pointing to evidence that Sheridan also knew of Jake's abnormal health conditions after reviewing Jake's forms, had time to call a physician or refer Jake to his cardiologist, and believed he was capable of evaluating Jake. The comparison is misplaced given the disparate facts and different standard of review applied there on the emergency exception, a different inquiry. Here, the

23

question of MICRA application is one of law on a narrow set of undisputed facts.

It is evident that during the course of an evaluation, a chiropractor may diagnose conditions to determine if they are outside the scope of chiropractic practice (Cal. Code Regs., tit. 16, § 302, subd. (a)(3); 59 Ops.Cal.Atty.Gen. at p. 423, *supra*) and not "subject to appropriate management by chiropractic methods and techniques." (Cal. Code Regs., tit. 16, § 317, subd. (w).) This type of diagnosis—as used in the colloquial sense—"do[es] not fall exclusively within the purview of the practice of medicine." (59 Ops.Cal.Atty.Gen. at p. 423, *supra*.) If a chiropractic practitioner identifies such a condition, disease or injury in a patient who has not disclosed they are already under appropriate care, but fails to "refer the patient to a physician . . . or other licensed heath care provider who can provide the appropriate management . . . within his or her scope of practice" (Cal. Code Regs., tit. 16, § 317, subd. (w)), then that chiropractor has engaged in unprofessional conduct. But that by itself does not qualify for a MICRA exception. (*Lopez, supra*, 12 Cal.5th at pp. 863-864; *Waters v. Bourhis, supra*, 40 Cal.3d at p. 436 [exempting acts from MICRA as within licensing restrictions "obviously was not intended to exclude an action from . . . MICRA . . . simply because a health care provider acts contrary to professional standards or engages in one of the many specified instances of 'unprofessional conduct' "].) As *Lopez* held, "a 'restriction imposed by the licensing agency' . . . 'must be a limitation on the scope of a provider's practice beyond simply the obligation to adhere to standards of professional conduct.' " (*Lopez*, at p. 863.) To the extent plaintiffs' action was based on Sheridan's failure to refer Jake to his treating cardiologist or other appropriate physician to make the clearance decision, it does not take the action outside MICRA.

24

## II. *Order Taxing Costs*

Plaintiffs ask us to reverse the trial court's order taxing their costs. Their sole point is that if we reverse the court's decision to apply MICRA, they will have obtained a more favorable judgment with respect to their Code of Civil Procedure section 998 offers. Because we affirm the court's application of MICRA, we do not disturb the order taxing costs.

## DISPOSITION

The judgment and postjudgment order are affirmed. Defendants Shamus Sheridan and Sheridan Chiropractic, Inc. shall recover costs on appeal.


O'ROURKE, Acting P. J.

WE CONCUR:


DATO, J.


RUBIN, J.